## COMMONWEALTH *vs.* JOSE RODRIGUEZ.

Norfolk. September 13, 1978. — November 15, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Delinquent Child. Criminal Records. Sex Offender. Evidence*, Juvenile records, Sex offender, Sexual misbehavior.

Although records of adjudications of juvenile delinquency were not criminal records within the meaning of G. L. c. 123A, § 5, they were admissible as "any other evidence" under § 5, where a commitment as a sexually dangerous person was made in lieu of sentence after a criminal conviction and the records were thus used in imposing sentence as permitted by c. 119, § 60. [634–642]

Evidence in a proceeding under G. L. c. 123A, § 1, including psychiatric testimony, was sufficient to warrant a finding that the defendant was a sexually dangerous person within the meaning of § 1, even though the Commonwealth's psychiatrists could not be certain whether in committing violent sexual crimes the defendant was sexually motivated or acting under a generalized violent impulse. [642–645]

Where in a proceeding under G. L. c. 123A, § 1, evidence was offered with respect to placing the defendant in a particular treatment program as an alternative to the Bridgewater Treatment Center but the judge made no findings with respect to any alternative placement, the case was remanded for the limited purpose of securing an explicit determination whether there was a feasible and better alternative to Bridgewater. [645-646]

PROCEEDING for commitment commenced in the Superior Court on July 22, 1977.

The case was heard by *Irwin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Eric D. Blumenson* for the defendant.

*Charles J. Hely*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. On September 28, 1976, the defendant Jose Rodriguez, then sixteen years of age, was complained of as being delinquent, in that on September 27 he had (in a single episode) committed the crimes of rape and assault and battery with a dangerous weapon. After a hearing in the Juvenile Session, Municipal Court of Brookline, the judge ordered the juvenile complaints dismissed and adult complaints to be issued.[1] The prosecution then took the usual course, and in the end, on July 20, 1977, the defendant, on trial by jury in the Superior Court, Norfolk County, was convicted of the offenses above named.

The trial judge postponed sentencing and on his own motion committed the defendant for a sixty-day observation period to the Treatment Center for sexually dangerous persons at Bridgewater State Hospital (G. L. c. 123A, § 4). The report of two psychiatrists, consultants at that institution, presented to the court, recommended commitment of the defendant to the Treatment Center as a "sexually dangerous person" (SDP) within the meaning of G. L. c. 123A, § 1.[2] There was a hearing on the recommendation on October 20 and 21, 1977. In order to establish under § 1 that there had been "repetitive" behavior tending to prove sexual dangerousness, the Commonwealth offered in evidence certified copies of adjudications made in the Municipal Court of the West Roxbury District on February 3, 1976, finding the defendant delinquent for the commission on June 24, 1975 (in a single episode), of assault with intent to commit rape and assault and battery with a dangerous weapon. These records were received over defense objections. There was further detailed testimony by the examining psychia-

---

[1] General Laws c. 119, § 61. For the procedure, see *A Juvenile* v. *Commonwealth*, 370 Mass. 272 (1976).

[2] The text of § 1 is reproduced at note 13, *infra*.

trists and by a psychiatrist on the part of the defendant. The judge on January 17, 1978, entered findings, ruling, and order to the effect that the defendant had been proved an SDP beyond a reasonable doubt. He ordered the defendant committed to the Treatment Center for an indeterminate period of one day to life (G. L. c. 123A, § 5).

The defendant takes his appeal from the determination and argues two points, that the judge erred, first, in receiving the delinquency adjudications in evidence; second, in holding that the evidence as a whole warranted a conclusion that the defendant was an SDP within the definitional § 1. We take up these points in turn, deferring to point 2 a summary of the evidence and expert opinion bearing on the defendant's psychological condition. We shall conclude that there was no error, but that a remand for clarification on a limited matter is advisable.

1. *Admissibility of adjudications of juvenile delinquency.* The defendant contends that the delinquency adjudications were not admissible as proof of the commission of the offenses involved, while conceding that it would be open to the Commonwealth to re-prove the offenses by the testimony of witnesses (which the defendant presumably could oppose by other testimony). The difficulties as well as the needlessness of such duplicative proof argue pragmatically against the defendant's position; but it must be owned that there is a problem here in the elucidation of related statutory sources, G. L. c. 123 A, § 5, governing the procedure, including the admission of evidence, in an SDP hearing, and G. L. c. 119, § 60, part of the juvenile delinquency law which regulates the use of delinquency adjudications in subsequent legal proceedings.

(a) *Juvenile records as "criminal."* We start with the pertinent provisions of § 5, as appearing in St. 1958, c. 646, § 1: "[I]t shall be competent to introduce evidence of the person's past criminal and psychiatric record and any other evidence that tends to indicate that he is a

sexually dangerous person. Any psychiatric report filed under this chapter shall be admissible in evidence in such proceeding." Can one fasten on the words "past criminal ... record" and say that a delinquency adjudication (necessarily based on the commission of a criminal offense) qualifies as such a record? This is not easy to maintain. Our juvenile delinquency law states at G. L. c. 119, § 53 (unchanged in text since 1906), that the law "shall be liberally construed so that the care, custody and discipline of the children brought before the court shall approximate as nearly as possible that which they should receive from their parents, and that, as far as practicable, they shall be treated, not as criminals, but as children in need of aid, encouragement and guidance. Proceedings against children ... shall not be deemed criminal proceedings." And this court has noted the legislative purpose "to keep ... delinquency proceedings from being regarded as criminal in character." See *Marsden* v. *Commonwealth*, 352 Mass. 564, 566 (1967).

But despite the general legislative expression, the delinquency process has assumed a kind of criminal character because it has progressively absorbed the adjective safeguards of ordinary criminal prosecutions. A half century's bitter experience has taught that where the safeguards attaching to criminal trials are forgone in juvenile proceedings, while the realities, after delinquency is found, fall short of the rehabilitative aspirations of the early sponsors of Juvenile Courts, children subjected to the process may be twice deprived.[3] So in *In re Gault*, 387 U.S. 1 (1967), the Supreme Court began to define what the Constitution required of juvenile proceedings before they could lead to deprivations of liberty. In a well known line of cases the Court has commanded adherence to various criminal protections.[4] An apparent retreat from this

---

[3] See Mr. Justice Fortas's remarks for the majority in *In re Gault*, 387 U.S. 1, 14-27 (1967).

[4] *Gault* held that due process required adequate written notice of the charges to the child and his parents or guardians (387 U.S. at

"criminalizing" of the juvenile process came with
*McKeiver* v. *Pennsylvania*, 403 U.S. 528 (1971), when the
Court declined to extend to juveniles the jury right as-
sured to defendants in criminal prosecutions by the
States.[5] Mr. Justice Blackmun said for a plurality: "Little
. . . is to be gained by any attempt simplistically to call the
juvenile court proceeding either 'civil' or 'criminal.' The
Court carefully has avoided this wooden approach." *Id.* at
541. He therefore attempted to strike a "judicious bal-
ance" between the aim of the constitutional guaranty
invoked and "the idealistic prospect of an intimate, infor-
mal protective proceeding" (*id.* at 545), and, as the jury
was thought not "a necessary component of accurate fact-
finding" (*id.* at 543), he struck the balance toward the
ideal of informality. See also the remarks in *Breed* v.
*Jones*, 421 U.S. 519, 529 (1975).

The functional development, mirrored in the Common-
wealth by legislation and decision over the years,[6] has left

---

31-34), representation by counsel, appointed if necessary (at 34-42),
observation of the privilege against self-incrimination (at 44-56), and
opportunity to confront and cross-examine adverse witnesses (at 56-
57). *In re Winship,* 397 U.S. 358 (1970), the Court held that proof
beyond a reasonable doubt, not merely by a preponderance of the
evidence, was required when a juvenile was charged with a crime.
Citing *Gault,* the Court in *Winship* said, "[C]ivil labels and good inten-
tions do not themselves obviate the need for criminal due process
safeguards in juvenile courts" (at 365-366). In *Breed* v. *Jones,* 421 U.S.
519 (1975), the guaranty against double jeopardy was extended to
juvenile proceedings.

[5] But in this Commonwealth a jury right is preserved to juveniles in
stated circumstances by G. L. c. 119, § 56; see *Commonwealth* v.
*Thomas,* 359 Mass. 386 (1971).

[6] Thus see, as to notification of right to counsel, *Marsden* v. *Com-
monwealth,* 352 Mass. 564 (1967) (decided shortly after *Gault*); as to
a beyond-a-reasonable-doubt standard for juvenile adjudications,
St. 1969, c. 838, § 15, amending G. L. c. 119, § 58 (enacted after *Gault,*
but anticipating *Winship*); and as to proceedings for issuance of an
adult complaint, the sequence of *A Juvenile, petitioner,* 364 Mass. 531
(1974); *Breed* v. *Jones,* 421 U.S. 519 (1975); St. 1975, c. 840, § 1, amend-
ing G. L. c. 119, § 61; *A Juvenile* v. *Commonwealth,* 370 Mass. 272,
280-283 (1976).

our juvenile procedure still unassimilated in many respects to the criminal, still relatively intimate, informal, and paternal. Except for limited situations,[7] the broad legislative policy prevails to preserve confidentiality of juvenile records and thus to prevent stigmatization. See *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.*, 374 Mass. 640, 651 (1978). Cf. *In re Winship*, 397 U.S. 358, 366 (1970). So also the conception remains that juveniles have limited responsibility for their behavior, a conception that shapes the kind and quality of their treatment for antisocial acts. Cf. White, J., concurring in *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 551-552 (1971). With such considerations in mind, we would be loath to say that the c. 123A, § 5, reference to "criminal . . . records," contrasting with the c. 119, § 53, characterization of juvenile proceedings as "civil," is properly read as embracing juvenile delinquency adjudications. It is worth noting that c. 119 had long been on the books when c. 123A, § 5, was written in 1958,[8] so the textual disparity could have come to the draftsman's attention. We add that we are influenced in some degree by the fact that most changes of juvenile procedure in the spirit of *In re Gault* were brought in at the urging of the juvenile and presumably to benefit him (see *Commonwealth* v. *Thomas*, 359 Mass. 386, 388 [1971]),[9] whereas in the present case the party resists the analogy to the criminal.

---

[7] As shown in point 1 (b), *infra*; and see note 9, *infra*.

[8] Chapter 123A, enacted in 1947, was revised in 1954 (St. 1954, c. 686) and again in 1958 (St. 1958, c. 646), when the current definition of "sexually dangerous person" was set out in § 1, and § 5 attained its present form. See McGarry & Cotton, A Study in Civil Commitment: The Massachusetts Sexually Dangerous Persons Act, 6 Harv. J. Legis. 263, 264-273 (1969); Tenney, Sex, Sanity and Stupidity in Massachusetts, 42 B.U.L. Rev. 1, 9-16 (1962); Fox, Criminal Law, Procedure and Administration, 6 Ann. Survey Mass. Law 95-99 (1959); Note, Out of Tune with the Times: The Massachusetts SDP Statute, 45 B.U.L. Rev. 391-395 (1965).

[9] *Davis* v. *Alaska*, 415 U.S. 308 (1974), is to be distinguished, as the constitutional right of confrontation overcame the juvenile's statutory

(b) *Juvenile records as "any other evidence."* If juvenile records do not qualify as "criminal" within that term as used in § 5, we have yet to deal with the further expression in the same section, "any other evidence that tends to indicate that he is a sexually dangerous person." This form of words appears to extend to delinquency adjudications whether classified as civil or criminal. However, by reason of *Commonwealth* v. *Bladsa,* 362 Mass. 539, 541 (1972), the "any other evidence" must be admissible according to some independent rule of admissibility.[10] The defendant proceeds to argue that, just as *Bladsa* disallowed hearsay (testimony of police reports, offered to prove the matters contained), so the court must disallow a delinquency adjudication because, he contends, it is declared inadmissible by c. 119, § 60. This reads in part, as amended through St. 1973, c. 1073, § 16: "An adjudication of any child as a delinquent child under ... [cited sections of the law], or the disposition thereunder of any child so adjudicated, or any evidence given in any case arising under said sections, shall not be lawful or proper evidence against such child for any purpose in any proceeding in any court, and records in cases arising against any child under said sections shall not be received in evidence or used in any way in any such proceeding, except in subsequent proceedings for delinquency against the same child and except in imposing sentence in any criminal proceeding against the same person ...." The defendant reads § 60 as a ban on the introduction of the

claim to confidentiality: a criminal defendant was held entitled to cross-examine a juvenile prosecution witness on the basis of his juvenile record. Our decision in *Commonwealth* v. *Ferrara,* 368 Mass. 182, 185 (1975), is analogous.

[10] The sentence of § 5 following—"Any psychiatric report filed under this chapter shall be admissible in evidence in such proceeding"— was held in *Bladsa* to allow admission of reports incorporating or based on hearsay; but the liberality does not extend beyond the reports to direct testimony derived from hearsay unless its admission is otherwise authorized. See *Andrews, petitioner,* 368 Mass. 468, 472-477 (1975).

juvenile adjudications in the SDP commitment hearing, unrelieved by the second exception. We disagree. Eschewing undue reliance on labels, including the label "civil" customarily attached to the SDP procedure,[11] we hold that an SDP hearing following upon conviction is in substance directed to "imposing sentence in any criminal proceeding" and the exception therefore applies.

Under c. 123A, § 5, a person may be brought to an SDP hearing after psychiatric observation and recommendation following conviction of any of several sexual crimes enumerated in § 4. Section 6 permits invocation of an SDP procedure with respect to a prisoner already serving a sentence for a crime (whether or not sexual) who appears to be sexually dangerous. In the former case, § 5 provides expressly that commitment after hearing to the Treatment Center as an SDP is "in lieu of the sentence required by law for the original offence."[12] For the latter

---

[11] Although unnecessary to the present discussion, we note the fact that the SDP procedure has become increasingly "criminalized." Thus see the revision of G. L. c. 123A by St. 1958, c. 646, § 1, to provide for notice, hearing, etc., for all potential SDPs; and the further procedural regularities assured by *Commonwealth* v. *Bladsa*, 362 Mass. 539 (1972) (evidentiary matters); *Commonwealth* v. *Lamb*, 365 Mass. 265 (1974) (patient-psychotherapist relation); St. 1974, c. 324, §§ 1-3, amending G. L. c. 123A, §§ 4, 6 (on reasonable notice); *Andrews, petitioner,*368 Mass. 468 (1975) (beyond-a-reasonable-doubt standard). There is comment on the movement toward full procedural protections in *Commonwealth* v. *Travis*, 372 Mass. 238, 250 (1977), and *Gomes* v. *Gaughan*, 471 F.2d 794, 799 (1st Cir. 1973).

[12] The indeterminate commitment to the Treatment Center may be varied by probation or suspension. The relevant passage is the second and third sentences of the third paragraph of § 5, reading as follows: "If the court finds that the person is a sexually dangerous person, it may, in lieu of the sentence required by law for the original offence, commit such person to the center, or a branch thereof, for an indeterminate period of a minimum of one day and a maximum of such person's natural life. The court may grant probation or suspend the commitment upon the condition that such person receive out-patient treatment and upon any other condition it might deem suitable, if the department of mental health recommends such person as a suitable subject for such out-patient treatment." The parallel provision of § 6 (sixth paragraph, second sentence) states: "If the court finds that such

case, the SDP commitment after hearing may result in longer restraint than the original sentence; but if, at any annual hearing to which an SDP is entitled, the Commonwealth fails in its burden of proving continued sexual dangerousness, and part of the original sentence then remains, the person is returned to ordinary confinement to serve the remainder of his term. See § 6; *Andrews, petitioner*, 368 Mass. 468, 485-486 (1975). Whatever possible cavil there may be about a case where the SDP commitment may extend beyond the original sentence, in the situation, which is the one before us, where the SDP commitment substitutes for a criminal sentence, we think there is no serious strain on the statutory language or theme in holding that the § 60 exception for sentencing proceedings is in point.

The same result is reached by a slightly different route. The defendant upon being found guilty of one of the enumerated offenses is before the court for disposition, and SDP commitment is an alternative available to the court in a unitary process intended to find the most suitable resolution for the particular person. The aim of the c. 119, § 60, exception was to permit the use of a juvenile adjudication in aid of a subsequent disposition of the same person, and, in harmony with the same aim, can and should be read to take in a form of disposition—SDP commitment—which came on the scene after the enactment in 1938 of that § 60 exception (St. 1938, c. 174). Such statutory interpretation is a commonplace. 2A C. Sands, Sutherland Statutory Construction § 49.01-49.02 (1973). Our language in *Police Comm'r of Boston* v. *Municipal*

prisoner is a sexually dangerous person, it shall commit him to the center, or a branch thereof, for an indeterminate period of a minimum of one day and a maximum of such person's natural life, for the purpose of treatment and rehabilitation, or it may commit such person to a mental institution or place him upon out-patient treatment, or make such other disposition upon the recommendation of the department of mental health consistent with the purpose of treatment and rehabilitation."

*Court of the Dorchester Dist.*, 374 Mass. 640, 651 (1978), was apt: we said that § 60 did not preclude use of the juvenile records "for purposes of disposition." A similar thought was expressed in *Thibodeau* v. *Massachusetts*, 428 F. Supp. 542, 545 (D. Mass. 1977). See also *Thibodeau* v. *Commonwealth*, 366 Mass. 452, 455 (1974); *Commonwealth* v. *Gomes*, 355 Mass. 479, 486 (1969).

Our conclusion seems to us to reconcile the policies behind § 60 and § 5. The former permits use of juvenile records where the purpose is not to stigmatize but to assist informed sentencing; the latter broadly invites the use of such relevant information in determining a proper course for the convicted defendant.

(c) *Minor points.* We dispose of the defendant's minor contentions. (i) Calling the juvenile adjudications "hearsay," the defendant argues that they should have been excluded under the *Bladsa* decision. But *Bladsa* indicated merely that the general language of G. L. c. 123A, § 5, did not provide a basis for the admission of evidence which under common law principle was inadmissible because hearsay. In that case there was no statute, modifying the common law, that called for the admission of the evidence. But if we are right about the exception to G. L. c. 119, § 60, that provision lays down a distinct and positive basis for the admission of the delinquency adjudications. We may add that there is little reason for regarding those adjudications as less deserving of admissibility than criminal convictions. Both are reached under fair, although to some extent divergent, procedures, and proof beyond a reasonable doubt is required as well for the former as the latter. See *In re Winship, supra*; G. L. c. 119, § 58. Cf. *Dutton* v. *Evans*, 400 U.S. 74, 80 (1970).

(ii) At oral argument, *North Carolina* v. *Alford*, 400 U.S. 25 (1970), was brought forward as tending to preclude our application of the § 60 exception. *Alford* decided that a defendant, although protesting his innocence, may still enter a valid guilty plea if his awareness of the possible penalty after trial (there, a death sentence) led

him to the voluntary, rational choice to plea-bargain. The defendant attempts to draw the inference that a guilty plea to a delinquency charge should be held invalid where the juvenile (or rather his advisers) could not have envisaged the use of the adjudication in an SDP hearing, following a later criminal conviction, that might lead to a restraint of indefinite duration. The defendant does not assert that he protested his innocence at the juvenile proceeding in 1975, but that aside, we do not think a plea is invalidated by a failure to apprehend at the time all possible contingent effects. And here one effect that the defendant could well apprehend, the use of the delinquency adjudication in connection with outright sentencing to prison for a later conviction of major crime, was not less serious than the use of the adjudication to ground an SDP commitment. See *Commonwealth* v. *Morrow*, 363 Mass. 601, 605-606 (1973). In this view we need not consider how foreseeable in 1975 was the decision we now reach in 1978.

2. *Sufficiency of the finding of sexual dangerousness.* The delinquency adjudications having been properly admitted in evidence, the defendant must be taken to have committed "repetitive" sexual offenses involving "violence" (see c. 123A, § 1[13])—the assault with intent to rape

---

[13] "The words 'sexually dangerous person' as used in this chapter shall have the following meaning:—Any person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive behavior and either violence, or aggression by an adult against a victim under the age of sixteen years, and who as a result is likely to attack or otherwise inflict injury on the objects of his uncontrolled or uncontrollable desires."

This definition derives in large part from the language of the Minnesota Supreme Court in *State ex rel. Pearson* v. *Probate Court of Ramsey County*, 205 Minn. 545, 555 (1939), where the Minnesota sex psychopath statute was upheld against a vagueness challenge. The Supreme Court of the United States subsequently upheld the law on the basis of the State court's narrowing construction. *Minnesota ex rel. Pearson* v. *Probate Court of Ramsey County*, 309 U.S. 270 (1940). See *Commonwealth* v. *Ackers*, 343 Mass. 63, 68-69 (1961).

in 1975 and the rape in 1976, with a dangerous weapon figuring in both episodes. The opinions of the psychiatrists assumed also certain background facts as shown in the probation report and other descriptive, diagnostic, and evaluative materials.[14] Born in Cuba, the defendant at the age of four came to this country with his parents. When he was nine, his parents were divorced, and each remarried. From the age of five, the defendant was in trouble: he attacked his classmates, tortured animals, and set fires; in later years his violence took other forms, including breaking and entering and armed robbery. By the age of twelve he was using alcohol almost daily. He also used a wide variety of illicit drugs and at one time he was probably addicted to Quaalude. Alcohol or drugs seem to have been a factor in the defendant's violence and apparently had a part in the 1975 incident and the rape in 1976. A succession of "placements" of the defendant over the years had had no lasting beneficial effects.

There was substantial agreement among the psychiatrists that, unless confined, the defendant would remain unable to control himself and would continue in his violent career with a significant probability, hard to reduce to a percentage figure, that he would commit further violent sexual crimes. That he had committed such crimes repetitively and in a materially similar pattern was a poor augury.

The psychiatrists called by the Commonwealth concluded that the defendant was an SDP under § 1[15] and

_____

[14] See note 10, *supra*.

[15] That is—tracking § 1—the defendant's "misconduct in sexual matters," as evidenced by the repetitive, violent sexual crimes, "[indicated] a general lack of power to control his sexual impulses," and as a result he was "likely to attack or otherwise inflict injury" on others. (The final expression "on the objects of his uncontrolled or uncontrollable desires" suggests, what is earlier intimated, that the foreseen future attacks or injuries must be sexual in character.) We have noted that the psychiatrists need not "testify in the precise words of the statute," *Commonwealth* v. *Dagle*, 345 Mass. 539, 543, cert. denied, 375 U.S. 863 (1963), because "[t]he determination of sexual dangerousness

should be committed to the Treatment Center at Bridgewater. They considered (as did the psychiatrist for the defense) that the defendant was "treatable": favorable factors were his above-average intelligence, the fact that he had sustained normal sex relations with a number of women, and that he had "related" to some extent with those seeking to help him during a stay at McLean Hospital in early 1977.

The defense psychiatrist sought to support the position that the element of uncontrollable sexual impulse was not made out here and hence the defendant should not be declared an SDP. Acknowledging the fact of past sexual offenses and the probability of future offenses of that kind, as noted above, the witness doubted that the "motivation" was sexual: in his view there was a generalized violent impulse, which could find expression in sexual assaults but might be vented in other ways as well. In this line, he thought the event of 1975 could be traced to a desire for revenge against the victim, who had assaulted the defendant's girl friend, and the later rape could be related to a burst of anger against the defendant's parents, which had somehow become misdirected to the second victim.

The Commonwealth psychiatrists conceded that it was difficult to discern the defendant's "motivation": the more so because the defendant, on advice of his counsel, had refused to discuss the two offenses.[16] And doubtless there are ineluctable difficulties in spelling out the content of § 1.[17] But these witnesses conceived that the statu-

---

is a legal and not a psychiatric question. . . . [T]he statutory requirement of prediction must rest with the judge." *Commonwealth v. McHoul*, 372 Mass. 11, 15-16 (1977).

[16] That interviews with the defendant are not indispensable to a psychiatric conclusion of sexual dangerousness is clear from *Commonwealth v. Childs*, 372 Mass. 25, 29-30 (1977).

[17] See generally S. J. Brakel & R. S. Rock, The Mentally Disabled and the Law, c. 10 (rev. ed. 1971); Dershowitz, Psychiatry in the Legal Process: "A Knife that Cuts Both Ways," in The Path of the Law from

tory definition and its purpose would be satisfied in the particular case even if it were assumed that anger or other frustration precipitated impulses toward sexual abuse of others which the defendant was unable to keep in check. (Just so, a person could be called sexually dangerous whose sexual misconduct was touched off by indulgence in alcohol, whether or not addictive—and such an element might actually be present here. See *Commonwealth* v. *Walsh, ante* 53, 58 [1978]. One may surmise that, even with the most pronounced sexual offender, sexual wrongdoing may be actuated by conditions having in themselves no apparent sexual ingredient.)

The judge's findings, whose basis we have elaborated in the foregoing account, led him to the conclusion on the whole record that the defendant was sexually dangerous. We cannot say that he was manifestly wrong in according with the Commonwealth psychiatrists, or that there was any lack of conformance to the statute. See *Commonwealth* v. *Walsh, supra* at 58-60; *Commonwealth* v. *McHoul,* 372 Mass. 11, 13-16 (1977); *Peterson, petitioner,* 354 Mass. 110, 117 (1968).

3. *Limited Remand.* The defense, contending that the defendant was not an SDP, suggested that if sentenced on the ordinary criminal basis he should go to the Massachusetts Correctional Institution at Concord. It went on to argue that if, on the other hand, the defendant were found sexually dangerous, commitment to the Treatment Center at Bridgewater would not be the only recourse for therapy and rehabilitation. See the provision of c. 123A, § 5, quoted at n.12; *Commonwealth* v. *Travis,* 372 Mass. 238, 247 n.4 (1977); *Commonwealth* v. *Bladsa,* 362 Mass. 539, 542 (1972). Specifically, the defense in the light of its psychiatric testimony tried to establish that the prefera-

1967, 71 (A. E. Sutherland, ed. 1968); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif. L. Rev. 693 (1974); Sadoff, Sexually Deviated Offenders, 40 Temple L.Q. 305 (1967); Guttmacher & Weihofen, Sex Offenses, 43 J. Crim. L. 153, 154-164 (1952).

ble place for this defendant was the then recently inaugu-
rated Adolescent Rehabilitation Program of the Solomon
Carter Fuller Mental Health Center at Boston University
Medical Complex, a high security facility for very violent
adolescents.[18] The Commonwealth attempted to show
that for the particular defendant this facility was inferior
to Bridgewater.[19]

Despite the rather extended testimony offered on the
point, the judge in declaring the defendant an SDP did
not allude at all to any alternative to Bridgewater. The
matter was important, and in the interest of clarity and
of fairness to all, we think the case should be remanded
for the limited purpose of securing an explicit determina-
tion whether there is at this time a feasible and better
alternative to Bridgewater within § 5. Cf. *Schulte* v. *Di-
rector of the Div. of Employment Security, ante* 107, 110
(1978). The Department of Mental Health should be invit-
ed to participate. It will be in the judge's discretion
whether or to what extent further evidence will be re-
ceived. (The matter may be handled at the annual review
of the defendant's status, see c. 123A, § 9, if that would
not entail delay.) We express no opinion as to the possible
existence of such a preferable alternative, but repeat
what is instinct in our opinions, that the purpose of an
SDP hearing is to find the best disposition available un-
der the statute, with the dual aims of protecting the pub-
lic against future antisocial behavior by the offender, and
of doing all that can be done to rehabilitate him.

---

[18] According to the testimony of the defense psychiatrist, this facili-
ty had a structured therapeutic and vocational program; the staff-to-
patient ratio was three to one. Commitment there would last for one
and a half to two years and be followed by residency in a "three-
quarter house." It appears that the admissions screening committee
of the Solomon Carter Fuller unit was willing to receive the defendant
for treatment.

[19] The Commonwealth suggested that the Solomon Carter Fuller
program was too short, and that the defendant should receive treat-
ment at the hands of those having specialized experience with sex
offenders.

The determination of sexual dangerousness will be affirmed, and the case remanded to the Superior Court for the purpose mentioned.[20]

*So ordered.*

---

[20] This disposition is contingent on appellate proceedings with respect to the convictions of rape and assault and battery with a dangerous weapon now pending in the Appeals Court.