387 Mass. 105 (1982)
438 N.E.2d 1064
COMMONWEALTH
vs.
STANLEY A. BARBOZA, JR.
Supreme Judicial Court of Massachusetts, Suffolk.
April 7, 1982.
August 5, 1982.
Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.
*106 John P. Courtney for the respondent.
Michael J. Traft, Assistant District Attorney (Paul J. McCallum, Legal Assistant to the District Attorney, with him) for the Commonwealth.
LIACOS, J.
On December 11, 1978, the respondent pleaded guilty to an indictment charging assault with intent to rape. On January 23, 1979, he was sentenced to one year in the Plymouth house of correction. On motion of the Commonwealth, on April 12, 1979, the respondent was committed to the treatment center at the Massachusetts Correctional Institution, Bridgewater (treatment center), for a period not to exceed sixty days in order to determine if he was a "sexually dangerous person" (SDP). See G.L.c. 123A, §§ 1 & 6. Based on a psychiatric report, the Commonwealth filed a motion in the Superior Court seeking to have the respondent committed to the treatment center. The respondent moved for an independent psychiatric examination. After a second psychiatric report was filed on June 10, 1980, the Commonwealth filed another petition for commitment pursuant to G.L.c. 123A, § 6. After a two-day hearing, the judge found, beyond a reasonable doubt, that the respondent was an SDP. At a further hearing on October 16, 1980, the judge ordered the respondent committed to the treatment center at Bridgewater for a minimum of one day and a maximum of life. The respondent claimed an appeal. We transferred the appeal here on our own motion and we now affirm.
The facts adduced at the respondent's two-day commitment hearing are as follows. The Commonwealth introduced in evidence the transcript of the respondent's December 11, 1978, guilty plea of assault with intent to rape and called as witnesses the two psychiatrists who had examined the respondent pursuant to the petition for commitment. Dr. Moore, a psychiatrist who twice interviewed the respondent, testified that, in his opinion, the respondent was *107 an SDP. Over objection by defense counsel, Dr. Moore related the basis of his opinion by recounting sexual incidents which had been described to him by the respondent during the course of his interviews.[1]
Dr. Moore concluded that, because the respondent had a history of sexual misbehavior which was gradually becoming more aggressive, the respondent was unable or unwilling to control his sexual impulses, and there was a likelihood of repetition of similar events in the future.
The second psychiatrist, Dr. Levy, had also interviewed the respondent twice and concluded that he was an SDP. Dr. Levy based his opinion on details of sexual incidents described to him by the respondent. The incidents were the same as those described to Dr. Moore. See note 1, supra. Dr. Levy concluded that the respondent's sexual thoughts or fantasies had actually developed into aggressive actions against women, and that the respondent felt it necessary to begin to act on what he was feeling.
The respondent presented testimony by a staff psychologist from the treatment center who testified that the respondent had not proved to be any difficulty for others at the treatment center.
The respondent alleges numerous errors. The respondent contends that the judge erred in (1) admitting in evidence statements made by the respondent during the psychiatric examination pursuant to G.L.c. 123A; (2) failing to strike the opinions of both psychiatrists because they were premised on factors beyond the psychiatrists' expertise; and (3) finding the respondent to be an SDP despite insufficient admissible evidence to warrant that finding. The respondent also contends that the order of commitment should be vacated because he was denied the fundamental constitutional *108 safeguards of (1) trial by jury, (2) Miranda warnings, (3) protection against double jeopardy, and (4) due process.
1. Evidentiary issues. The respondent argues that G.L.c. 233, § 20B, the patient-psychotherapist evidentiary privilege, bars the admission in evidence of all the respondent's statements made during the psychiatric examinations.[2] After the psychiatrists testified that they had informed the respondent that their conversations were not confidential and could be used against him in a proceeding to determine whether he was an SDP, the judge determined that the respondent made an intelligent and voluntary waiver and agreed to speak with the psychiatrists. The judge characterized the respondent's statements as "admissions" and allowed their admission in evidence to explain the basis of the psychiatric conclusion that the respondent was an SDP. There was no error.
When a patient is warned that statements made to a psychiatrist are not privileged, § 20B (b) permits a judge to admit the patient's communications in evidence in a proceeding pursuant to G.L.c. 123A. See Commonwealth v. Lamb, 365 Mass. 265, 266-269 (1974). General Laws c. 233, § 20B (b), allows admission of the patient's communications "only on issues involving the patient's mental or emotional *109 condition but not as a confession or admission of guilt." G.L.c. 233, § 20B (b), inserted by St. 1968, c. 418. The judge, in the instant case, admitted the statements for purposes relating to the respondent's mental or emotional condition. The proceeding was one to determine whether the respondent was an SDP, and the judge admitted the psychiatrists' testimony of the respondent's communications for the purpose of learning the basis of the expert opinions. The evidence was helpful to the judge in evaluating the psychiatrists' testimony.[3] This was not a proceeding in which a defendant was on trial for criminal charges and thus cases such as Blaisdell v. Commonwealth, 372 Mass. 753 (1977), and Commonwealth v. O'Connor, 7 Mass. App. Ct. 314 (1979), are inapplicable.[4]
Although we have not considered c. 123A proceedings to be criminal in nature, we have concluded that, because the liberty interests of a respondent are at stake, a respondent is "entitled to the benefit of the same stringent standard of proof as that required in criminal cases." Andrews, petitioner, 368 Mass. 468, 488 (1975). The respondent contends that there was insufficient evidence for the judge to have concluded beyond a reasonable doubt that the respondent *110 was an SDP. Thus, our task on appellate review of an insufficient evidence claim is similar to the review of a denial of a motion for a required finding of not guilty. We "determine whether the record evidence could reasonably support a finding ... beyond a reasonable doubt" that the respondent is an SDP. Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting from Jackson v. Virginia, 443 U.S. 307, 318 (1979).
The testifying psychiatrists concluded, on the basis of the respondent's past, present, and possible future sexual misconduct, that the respondent was an SDP. The respondent did not present evidence to the contrary. The testimony revealed that the respondent was becoming more aggressive with the passage of time, and the seriousness of his sexual misconduct was escalating. Based in part upon the respondent's conviction of assault with intent to rape, Dr. Moore testified that the respondent was unable or unwilling to control his sexual impulses and that there was a likelihood that the respondent would injure someone in the future. Dr. Levy also testified that the respondent's original compulsive thoughts and fantasies had developed into aggressive actions against women and that there was a progressive increase in violence in these offenses. The respondent's history was described as voyeuristic and compulsive.
We think that the judge, on the basis of the above-recited testimony, could have concluded beyond a reasonable doubt that the respondent was an SDP within the meaning of G.L.c. 123A, § 1, and thus there was no error. Cf. Commonwealth v. Lamb, 372 Mass. 17, 24 (1977).
2. Constitutional issues. The respondent maintains that the Commonwealth's petition for commitment must nevertheless be denied because the proceedings under G.L.c. 123A did not provide him with the same constitutional protections that are accorded an accused in a criminal prosecution. The respondent argues that the rights applicable to criminal proceedings, such as a trial by jury, the protection afforded by Miranda warnings, and the right not to be placed twice in jeopardy, must be extended to c. 123A proceedings *111 under Federal and State constitutional principles. The Commonwealth simply argues that proceedings under c. 123A are civil in nature and thus the rights of the criminal defendant are inapplicable.
We have previously held, and we reiterate the holding today, that whether c. 123A proceedings are labelled civil or criminal does not answer fully what procedural safeguards are required in such proceedings. "Rather, in deciding what safeguards are required, it is necessary to look at the nature of the right which the State seeks to circumscribe. The more precious the right, the greater the protection, whether the proceedings be labelled civil or criminal. See Commonwealth v. Travis, 372 Mass. 238, 246 (1977); Andrews, petitioner, [supra at 487-488]. Accord, Doe v. Doe, 377 Mass. 272, 280-281 (1979)." Commonwealth v. Knowlton, 378 Mass. 479, 487 (1979). See Commonwealth v. Rodriguez, 376 Mass. 632, 639 & n. 11 (1978). The respondent's right at issue here is the "potential deprivation of liberty" which we once described as "massive." Commonwealth v. Travis, supra at 249. See also Lessard v. Schmidt, 349 F. Supp. 1078, 1089 (E.D. Wis. 1972) (discussing social stigma attached to persons involuntarily committed).
Trial by jury. The respondent argues that he has a constitutional right to a trial by jury because c. 123A is punitive in nature, and the proceedings thereunder are criminal. We disagree. "General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted `with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him.' Commonwealth v. Rodriguez, [supra at 646]." Commonwealth v. Knowlton, supra at 483. "The statute ... does not intend punishment and does not in terms impose it, and nothing therein justifies punitive treatment or confinement under any prison conditions, except such as are reasonably required for security.... Indeed, implicit in the statute and its purpose is the obligation to provide an environment conducive to a cure or an alleviation *112 of the dangerous trait" (citations omitted). Commonwealth v. Major, 354 Mass. 666, 668 (1968), cert. denied, 393 U.S. 1109 (1969). "Both the Massachusetts court and legislature have made considerable effort to differentiate between the treatment of the sexually dangerous, on the one hand, and the penalizing of criminals on the other." Gomes v. Gaughan, 471 F.2d 794, 800 (1st Cir.1973).
Not all the due process procedures applicable in a criminal prosecution for Federal constitutional purposes apply to a c. 123A proceeding. Accord, Gomes v. Gaughan, supra at 799. Cf. Specht v. Patterson, 386 U.S. 605, 609-610 (1967). "The Supreme Court has yet to determine if the Sixth Amendment and the full range of rights conferred under decisional law in criminal cases applies to proceedings of this nature" (citation omitted). Gomes, supra. Compare Humphrey v. Cady, 405 U.S. 504, 512 (1972). We decline to extend the Sixth Amendment right to a trial by jury to these proceedings.
The respondent, however, also argues that art. 12 of the Declaration of Rights of the Massachusetts Constitution requires that he be afforded a trial by jury in the c. 123A proceeding.[5] In matters that are noncriminal, art. 12 sets forth applicable principles of substantive and procedural due process of law. See Commonwealth v. One 1972 ChevroletVan, 385 Mass. 198, 200 n. 1 (1982). The issue is, therefore, whether due process of law under the State Constitution requires a jury trial in this instance. In determining what process is due we have stated that this court "must balance the interests of the individual affected, the risk of erroneous deprivation of those interests and the government's interest in the efficient and economic administration of its affairs." Thompson v. Commonwealth, 386 Mass. 811, 817 (1982). As noted earlier, the respondent's liberty interest is at stake, and we recognize the social stigma attached to a person who has been involuntarily committed.
*113 Balancing the interests affected, we conclude that no jury trial was due to the respondent.[6] We perceive no significant protection to be given a respondent in such a proceeding by virtue of a trial by jury. The procedural requirements of G.L.c. 123A provide ample protection of the individual's due process rights. See generally Andrews, petitioner, 368 Mass. 468, 481-490 (1975); Sarzen v. Gaughan, 489 F.2d 1076, 1084-1086 (1st Cir.1973). In the evaluation of expert testimony, the major fact-finding determination involved in an SDP proceeding, the presence of a jury is not an essential component of accurate fact finding. Compare McKeiver v. Pennsylvania, 403 U.S. 528, 545-547 (1971). Cf. Commonwealth v. L'Italien, 352 Mass. 424, 426, cert. denied, 389 U.S. 962 (1967). The community involvement ensured by a jury trial is outweighed, we think, by the possible substantial sacrifice of the State's interest in expedited hearings and the individual's right to privacy.[7]
Miranda warnings. As noted in Commonwealth v. Lamb, 365 Mass. 265, 269 (1974), procedures that must be constitutionally accorded to the respondent in a c. 123A proceeding are not identical to those required for persons accused of crimes. As a matter of constitutional due process, we held, in Lamb, that a patient had a right to keep privileged any communications made to a psychotherapist in the course of a court ordered examination "absent a showing that he was informed that the communication would not be privileged and thus, inferentially, that it would be used at the commitment hearing." Commonwealth v. Lamb, 365 Mass. at 270. The warnings required *114 by Lamb are sufficient to protect the respondent's due process rights in this instance.
We consider whether the Fifth Amendment privilege against self-incrimination, applicable to the States through the Fourteenth Amendment to the Federal Constitution, see Malloy v. Hogan, 378 U.S. 1, 3 (1964), is implicated in a c. 123A proceeding. Although the privilege against self-incrimination can be claimed in any proceeding, be it civil or criminal, it protects only those disclosures that could be used in criminal prosecutions. Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 94 (1964) (White, J., concurring).[8] As stated earlier in this opinion, we do not view c. 123A proceedings as criminal prosecutions, and thus the Fifth Amendment is not violated by the use of the respondent's statements to his psychiatrists at his c. 123A hearing. See generally Gomes v. Gaughan, supra at 799. Cf. Blaisdell v. Commonwealth, 372 Mass. 753, 769 (1977) ("[e]xaminations ordered by the court under G.L.c. 123, § 15, within the constraints of G.L.c. 233, § 23B, properly limited to the issue of competency to stand trial, would not ordinarily involve the problems of privilege ...").
The defendant relies on Estelle v. Smith, 451 U.S. 454 (1981), in his claim that the Fifth Amendment privilege against self-incrimination and Miranda warnings are applicable to c. 123A proceedings. The Estelle Court held that the use of psychiatric testimony at the sentencing stage of the defendant's criminal prosecution violated the defendant's Fifth Amendment privilege when the defendant did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and of the possible use of his statements against him. The Estelle Court noted, supra at 467, "[W]hen [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase *115 on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest [pretrial] custodial setting." "Just as the Fifth Amendment prevents a criminal defendant from being made `the deluded instrument of his own conviction,' ... it protects him as well from being made the `deluded instrument' of his own execution" (citations omitted). Estelle, supra at 462.
The proceeding in the instant case is altogether distinguishable from that in the Estelle case. The respondent in Estelle was a criminal defendant. His pretrial, postarrest statements were used against him in a phase of his capital murder trial, in the absence of any observation by the State of fundamental constitutional guarantees. No such issues are involved in this case.
Double jeopardy. The respondent next contends that he was placed twice in jeopardy because he received two sentences for a single crime. We disagree. The respondent's prison sentence was for the crime of assault with intent to rape, to which he pleaded guilty; his subsequent commitment to the treatment center "resulted from the finding, in a separate proceeding, of sexual dangerousness." Gomes v. Gaughan, supra at 797. The issues before the court and the evidence presented were entirely different in the two proceedings. See Commonwealth v. Gomes, 355 Mass. 479, 485-486 (1969), habeas corpus denied sub nom. Gomes v. Gaughan, 471 F.2d 794 (1st Cir.1973). See also Commonwealth v. Dagle, 345 Mass. 539, 539-541 cert. denied, 375 U.S. 863 (1963). Cf. Commonwealth v. Chase, 385 Mass. 461, 464 n. 3 (1982); Commonwealth v. Dias, 385 Mass. 455, 458 (1982).
Due process. The respondent's final argument is that the entire proceeding, pursuant to G.L.c. 123A, denied him the due process safeguards required by the Fourteenth Amendment. The respondent does not point to any procedure required by c. 123A that was not carried out in his proceeding. Rather, the respondent alleges that the petition for commitment that referred to the two psychiatric reports *116 was vague and gave no substance of the testimony to be elicited at the hearing from any witness. We disagree. Our reading of the record indicates that the respondent was given adequate and timely notice of the c. 123A proceeding. Throughout, the respondent was represented by counsel who cross-examined the Commonwealth's psychiatrists and vigorously argued evidentiary and constitutional points to the judge. We read nothing in the record to indicate that the respondent was denied his right to procedural due process. There was no error.
Judgment affirmed. *264 members can constitute "cause" to terminate a tenancy.[6]
At the same time, two circumstances lead us to conclude that, when termination is based on prohibited conduct by a tenant's household member, "cause" requires that there be some connection between the tenant and the conduct underlying the termination. The first influential circumstance is the severity of the consequences of eviction. See Caulder v. Durham Hous. Auth., 433 F.2d 998, 1003 (4th Cir.1970), cert. denied, 401 U.S. 1003 (1971); McQueen v. Druker, 317 F. Supp. 1122, 1130 (D. Mass. 1970), aff'd, 438 F.2d 781 (1st Cir.1971). The BHA's housing developments provide housing of last resort. Admission is conditioned on serious need. G.L.c. 121B, § 32. A determination to evict entire families for acts that they could not avert by any means, while it might not be arbitrary or irrational in the constitutional sense,[7] is nevertheless contrary to the concept of fair and reasonable treatment implicit in the requirement of "cause."
A second, perhaps related, circumstance is the presence of unsettled constitutional questions. As will be seen, we are not persuaded that "personal responsibility" is a constitutional prerequisite to eviction for the acts of household members. Nevertheless, we prefer to read the statute in a way that will avoid constitutional doubts. See, e.g., Worcester County Nat'l Bank v. Commissioner of Banks, 340 Mass. 695, 701 (1960).
*265 This is not to say that we endorse, in our construction of § 32, the tenants' proposal that the BHA cannot terminate their tenancies without affirmative proof that they knew or had reason to know of their sons' violent propensities, and were able to control their sons' conduct. Cf. Caldwell v. Zaher, 344 Mass. 590, 592 (1962).[8] The requirement we discern in § 32 is not so broad. When the wrongdoer is a household member, a fair inference exists that the tenant is aware of potential problems, and able to exercise some influence or otherwise prevent violent and destructive conduct on the premises. Problems of unfairness arise only because this may not hold true in every case. Accordingly, we understand the "cause" requirement of § 32 simply to mean that a tenant should not be evicted if special circumstances are present to negate the inference that she could have averted the lease violation. In other words, if the tenant can show that she could not have foreseen and prevented her son's violence, there is no "cause" to evict her within § 32.
The evidence in the present cases does not negate the inference of awareness of and ability to prevent violence. Neither tenant identified circumstances, such as the wrongdoer's very young age or prior record of good conduct, that *266 might have made violent conduct unforeseeable. In fact, there was in each case some prior warning of trouble.[9] Nor were there any facts suggesting that the tenants were completely unable to take any measures to prevent violence. Mrs. Bunting testified, and the judge in her case found, that she was unable to control her son's actions. A tenant's ability to avert violent conduct by a household member on housing authority premises, however, extends beyond the power actually to control his conduct by force or persuasion. If the potential offender is a minor child, the tenant could seek counselling, temporary substitute care or other forms of aid through the Department of Social Services. See, e.g., G.L.c. 119, §§ 23(A), 39E. If an adult member of the household is uncontrollable and likely to commit serious acts of violence, the tenant reasonably could refuse to permit him to stay with her, and could seek outside help in preventing his continued presence. When a tenant has taken such measures, she has done all she can, and should not be held responsible for violence that nevertheless occurs. Here, however, neither tenant appears to have taken any steps to prevent the violence and destruction that led to her eviction.
3. Constitutional Claims.
a. Personal responsibility. We turn now to the tenants' argument that the BHA could not constitutionally terminate their tenancies without proof that they were responsible for their sons' acts. The tenants' claims to constitutional protection reach beyond the relief provided by our construction of G.L.c. 121B, § 32. Both tenants would require *267 the BHA to prove that they knew or had reason to know of their sons' violent tendencies, and were able to control the sons' conduct, and Bunting appears to argue that some form of actual involvement or complicity must be shown.[10] We believe that the tenants have overstated constitutional requirements, and that G.L.c. 121B, § 32, as construed, is fully consistent with due process.
The tenants' claims are based on a perceived principle of substantive due process[11] protecting individuals against punishment without "personal guilt." As evidence of this principle, they point to various statements of the United States Supreme Court indicating that government cannot impose legal burdens solely on the basis of a status or association of the burdened individual. In Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175 (1972), for example, the Court, discussing denial of worker's compensation benefits to illegitimate children, stated that "imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." See, in addition, *268 Plyler v. Doe, 457 U.S. 202 (June 15, 1982) (holding unconstitutional a statute denying public education to children of illegal aliens); Wieman v. Updegraff, 344 U.S. 183, 191 (1952) (holding unconstitutional a loyalty oath, required for public employment, that covered innocent as well as knowing membership in subversive organizations). Cf. Robinson v. California, 370 U.S. 660, 667 (1962) (criminal penalty for narcotics addiction, an "illness" that can be acquired involuntarily, is cruel and unusual punishment barred by Eighth and Fourteenth Amendments); Lambert v. California, 355 U.S. 225, 227-230 (1957) (law requiring convicted felons to register with local authorities is unconstitutionally applied when defendant had no actual or probable knowledge of duty to register). The specific phrase, "personal guilt," derives from a statement by Justice Harlan in Scales v. United States, 367 U.S. 203 (1961), a decision upholding a conviction under the Smith Act for knowing and active membership in an organization advocating violent overthrow of the government. "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ... that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." Id. at 224-225.
Several lower Federal courts have applied the concept of "personal guilt" described by Justice Harlan in civil contexts, including that of eviction from public housing. Tyson v. New York City Hous. Auth., 369 F. Supp. 513, 518-519 (S.D.N.Y. 1974) (holding unconstitutional evictions based on the conduct of adult children not living in the tenants' households at the time of the wrongful conduct). See St. Ann v. Palisi, 495 F.2d 423, 425-428 (5th Cir.1974) (holding unconstitutional suspension of children from public school because of mother's conduct toward school officials). Other courts, however, have upheld termination of public housing tenancies on the basis of conduct by household *269 members, without requiring proof of the evicted tenant's scienter or ability to control the wrongdoer's conduct. See Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937, 946 (2d Cir.1974) (distinguishing Tyson v. New York City Hous. Auth., supra, on ground that all wrongdoers were household members and one was a named tenant); Housing Auth. of Atlanta v. Davis, 158 Ga. App. 600 (1981); Tompkins Square Neighbors, Inc. v. Zaragoza, 43 App. Div.2d 551 (1973), appeal dismissed, 34 N.Y.2d 737 (1974); Portugues v. Golar, 75 Misc.2d 893 (N.Y. Sup. Ct. 1973); Housing Auth. of Portland v. Bahr, 25 Or. App. 117 (1976).
The problems that have prompted the Supreme Court to speak of personal responsibility, or "guilt," are distinguishable from the present cases. They have involved criminal penalties inhibiting political association, e.g., Scales v. United States, supra, arbitrary classifications, e.g., Plyler v. Doe, supra, or other particular forms of injustice that can be limited to the facts presented, e.g., Robinson v. California, supra (criminal penalties for illness). The tenants here have not identified an impermissible classification, or, apart from the asserted punishment without responsibility, an intrusion upon individual rights. Cf. Bryan v. Kitamura, 529 F. Supp. 394, 398-402 (D. Haw. 1982) (statute imposing strict vicarious liability on parents for children's torts infringes no fundamental right, and draws no suspect classification).
Despite these points of distinction, we are willing to assume that the Court's various statements reflect a principle that punitive action must be based on personal responsibility. In other words, when the only justification for a legal burden, penalty, or classification is to punish or deter conduct, the burden cannot fairly be imposed on individuals who have no means of avoiding it. If punishment or deterrence is directed toward individuals who cannot affect the offending conduct, it is illogical. If it is directed toward the wrongdoer, whom the government hopes to reach through its action toward those close to him, it may be logical and *270 effective, but it may also be contrary to basic justice. See Plyler v. Doe, supra, at 220; Weber v. Aetna Cas. & Sur. Co., supra at 175.
We believe, however, that the tenants have conceived this concept of personal responsibility too broadly in their attempt to apply it to the present cases. First, we doubt that it has any application when the imposition is supported by reasons of public health, safety, or welfare, apart from mere deterrence of others' conduct. Action against individuals in a particular position often may contribute directly and significantly to the solution of a problem of health, safety, or welfare despite the fact that the burdened individuals have not, by any act or omission, caused the problem. Examples can be found in the operation of zoning regulations, see, e.g., Pierce v. Wellesley, 336 Mass. 517, 522-523 (1957), or workers' compensation laws, see, e.g., Caswell's Case, 305 Mass. 500, 502 (1940). In such a case, there is a legitimate connection between the individual and the imposition, beyond the mere possibility that he can be used to influence another. Unless the government action in question involves an improper classification, or encroaches on constitutionally protected substantive rights, the balance of affected interests is best left to the judgment of legislative and administrative bodies, and the constitutional issue narrows to one of rational relationship between means and ends. See Bogan v. New London Hous. Auth., 366 F. Supp. 861, 867-870 (D. Conn. 1973). See also Bryan v. Kitamura, 529 F. Supp. 394, 398-400 (D. Haw. 1982) (upholding strict parental liability for child's tort); Board of Educ. of Piscatoway Township v. Caffiero, 86 N.J. 308, 317-320, appeal dismissed, 454 U.S. 1025 (1981), and cases cited (same). Cf. Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 487-488 (1955); Nebbia v. New York, 291 U.S. 502, 537-539 (1934); Miller v. Schoene, 276 U.S. 272, 279-280 (1928).
The BHA's purpose is clear, and certainly legitimate. It seeks to promote safety in the housing projects. It suggests two ways in which eviction of the Gormley and Bunting *271 families on the basis of violent acts by household members, without inquiry into the tenants' ability to foresee or control the violence, would further this purpose. The first is deterrence; other destructive children, realizing the consequences that their violence might visit on their families, would be less likely to engage in violent conduct. For reasons we have stated, we assume that this reasoning alone will not support the BHA's action. An attempt to deter one person through harm or threat of harm to those close to him may, despite its possible effectiveness, controvert principles of due process.
The BHA presents a second, more persuasive justification for eviction of the wrongdoer's family. Prompt and complete removal of a violent resident is an effective means of preventing further violence. The continued presence of the wrongdoer's household, however, is likely to attract him to the project. Evicting the entire household minimizes the possibility of return. The tenants propose alternative ways to keep the wrongdoer away from the housing projects, such as an agreement conditioning the mothers' continued tenancy on their prevention of the sons' return, or an injunction.[12] Such measures, however, might be difficult to enforce, and would leave open the possibility of another round of violence before the final solution of eviction could be imposed. Further, enforcement could draw the BHA far into regulation of family life. Cf. McKenna v. Peekskill Hous. Auth., 647 F.2d 332, 335 (2d Cir.1981) (requirement that tenants disclose and obtain management approval for overnight guests invaded tenants' privacy). In any event, the Legislature, or the BHA, is not bound to choose the best or gentlest of methods to achieve the objective of safe housing. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 487-488 (1955). In some circumstances, eviction of tenants on the ground that they will attract undesirable visitors *272 might cross the line of rationality. If the wrongdoer were dead, or confined for an extended period of time, eviction would serve no purpose. If the unwanted visitor were not a household member, the likelihood that the tenant's presence would attract him to the project might be too slight to sustain the eviction. Cf. Tyson v. New York City Hous. Auth., 369 F. Supp. 513, 518-519 (S.D.N.Y. 1974). But when a household member has committed serious acts of violence, and is likely to return in the reasonably near future, eviction may be an effective safety measure.[13]
Eviction might seem a harsh measure when applied to tenants who had done what they could to prevent violence by household members. We have assumed, in construing the general requirement of "cause" in G.L.c. 121B, § 32, that the Legislature intended to provide some relief in such a case. But even if the statute permitted eviction of tenants who could not have foreseen or affected the conduct of household members, and so bore no degree of personal responsibility, we would hesitate to hold the eviction was unrelated to safety or otherwise beyond the power of the Legislature.
Our construction of § 32, however, provides an alternative and more definite reason to uphold evictions based on acts by household members. Even if we assume that the government is restrained by a requirement that all legal burdens  even those that directly serve public health, welfare, or safety  must be based on personal responsibility, that requirement is satisfied by the "cause" requirement of § 32, as we have construed it. In the relationship of a tenant to a member of her household, particularly a child, the natural inference that the tenant is aware of and able to *273 prevent potential misconduct, qualified by an opportunity to prove otherwise, provides a substantial connection between the relationship (tenant-household member) and the conduct that is the target of government action. See Scales v. United States, supra. Contrast Tyson v. New York City Hous. Auth., 369 F. Supp. 513, 519 (S.D.N.Y. 1974) ("causal nexus" necessary to support eviction lacking when son was not living in mother's household). We believe that this rebuttable inference of responsibility fully satisfies the requirements of due process.[14] Contrast, e.g., United States Dep't of Agriculture v. Murray, 413 U.S. 508, 511 (1973) (statute making household ineligible for food stamps if one member is over eighteen and has been claimed by another person as a tax dependent creates "conclusive presumption" that the household is not needy).
The element of personal responsibility encompassed by § 32 also adds to the connection between eviction and legitimate government purposes. As construed, § 32 serves to encourage tenants to attempt to guide the conduct of household members, and to seek help when they are unable to. Thus, there is additional reason to conclude that an eviction under § 32 is not an arbitrary measure.
b. Standard of proof. The tenants argue that principles of procedural due process require particularly strong proof that members of their households committed the acts of violence on which the evictions are founded. In each case, the judge applied the ordinary civil standard of proof by a "preponderance" of evidence. The tenants insist that the proper standard was at least that of "clear and convincing" proof, if not that of proof "beyond a reasonable doubt." We conclude that no special standard of proof was necessary.
*274 The standard of proof is an element of the minimum procedural due process required in proceedings affecting protected "liberty" or "property" interests. Santosky v. Kramer, 455 U.S. 745, 755-756 (1982). Proof beyond a reasonable doubt is constitutionally required in criminal cases. In re Winship, 397 U.S. 358, 364 (1970). In addition, the Supreme Court has imposed a standard of "clear and convincing" proof in State civil proceedings for permanent termination of parents' custody of a child, Santosky v. Kramer, supra at 767-768, and for indefinite, involuntary commitment of an individual to a mental hospital, Addington v. Texas, 441 U.S. 418, 433 (1979). In each case, the State was required as a matter of Federal constitutional law to present stronger than ordinary proof that State statutory conditions had been fulfilled. The Court has also imposed, without specific reference to due process, standards of proof higher than a preponderance of evidence under certain Federal statutes. Woodby v. Immigration & Naturalization Serv., 385 U.S. 276, 284-285 (1966) (deportation). Chaunt v. United States, 364 U.S. 350, 353 (1960) (denaturalization). Schneiderman v. United States, 320 U.S. 118, 125 (1943) (denaturalization).
Minimum due process varies with context. In Mathews v. Eldridge, 424 U.S. 319, 335 (1976), the Court identified three "distinct factors" that determine what procedures are necessary in particular cases affecting protected "liberty" or "property" interests. These are "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
The first consideration  the individual rights that may be affected  is particularly important here because a standard of proof is itself a reflection, and a signal to the factfinder, of the significance of the rights at stake. See Addington *275 v. Texas, supra at 425; In re Winship, supra at 370 (Harlan, J., concurring). In Santosky v. Kramer, supra at 753, the State's custody proceeding put at issue a "fundamental liberty interest of natural parents in the care, custody, and management of their child." In Addington v. Texas, supra, the individual was threatened with loss of physical liberty.
A tenant's interest in her public housing tenancy, formalized in her lease as well as in the statutory requirement of "cause," is a protected interest, entitling her to fair procedures before the government can terminate it. See, e.g., McQueen v. Druker, 317 F. Supp. 1122, 1130 (D. Mass. 1970). See generally L. Tribe, American Constitutional Law 522-532 (1978).[15] A public housing tenancy is also of great personal importance to the tenant and her family, who may have nowhere else to turn. Nevertheless, housing is not within the small circle of interests recognized as "fundamental." Cf. Lindsey v. Normet, 405 U.S. 56, 73-74 (1972). The right to public housing derives from no deeper source than the State's undertaking to provide it. It may greatly affect the quality of life, but it is not as essential to human character as freedom from indefinite confinement, or the relationship between parent and child.[16]
The second measure of minimum procedure is the risk of error. Any increase in the housing authority's burden of proof will, of course, diminish the risk of erroneous deprivation of individual rights. Under any given standard, however, the risks of error are fewer in a summary process proceeding based on acts of violence than in commitment proceedings or proceedings to determine parental unfitness. The housing *276 authority, it is true, is likely to have superior resources for litigation, creating an imbalance between adversaries. The central issue to be determined, however, is a simple one of occurrence or nonoccurrence of objective facts.[17] The process of adjudication is not subject to the misleading influences present in Santosky v. Kramer, supra at 761-763 (imprecise standards, subjective questions, and vulnerability to class or cultural bias) and Addington v. Texas, supra at 426-427 (risk of precipitous commitment on basis of isolated idiosyncratic behavior).
The State, and housing authority tenants, have a strong interest in effective use of available measures to combat the terrifying incidence of violence in the housing projects. The State's specific interests in evicting tenants whose household members have participated in acts of violence and destruction within the projects have already been identified  prompt and effective removal of the wrongdoer from the housing project, and encouragement of tenants to monitor and restrain the conduct of household members. Eviction on the basis of an erroneous determination of the relevant facts will not, of course, promote these interests. See Santosky v. Kramer, supra at 765-766; Addington v. Texas, supra at 426. On the other hand the State's interests call for eviction whenever the facts warrant it. A stricter standard of proof would frustrate them by increasing the likelihood of error in the tenants' favor.
Applying the three Mathews v. Eldridge factors in the light of comparison with the situations in which the Supreme Court has required special degrees of proof in State proceedings, we conclude that due process does not demand a special standard of proof in proceedings to evict tenants from public housing on the basis of violent acts by household members. *277 The tenants' interests are important, but not "fundamental." There is no unusual risk of error. Finally, the interests of the State and other tenants in realizing the safety benefits of eviction weigh against a standard that would alter in the tenants' favor the ordinary allocation of the risk of erroneous factfinding.
4. Sufficiency of the Evidence of Violent Acts by Household Members.
Each tenant contends that the evidence connecting her son to firebombings on housing project premises was insufficient under any standard of proof. We review the evidence briefly, and conclude that in each case the judge's finding that the tenant's son participated in violent acts was supported by at least a preponderance of evidence.
a. Mark McDonough. The BHA began eviction procedures against Mrs. Gormley on the ground that her son Mark McDonough had participated in a firebombing on BHA premises, and had assaulted a BHA employee on BHA premises.[18] At trial in the Housing Court, a resident of the firebombed apartment, who knew Mark, testified that she had seen Mark and two others running from the area immediately after the firebomb was thrown. No one else was in view. The witness's younger brother, who also knew Mark, testified that he had seen Mark near the building just before the incident, and again some time after the incident, and had heard Mark ask a firefighter what had happened. Mark, his mother, and a neighbor testified that Mark had been asleep at home at the time of the firebombing.
Mrs. Gormley contends that Mark's presence at the scene of the firebombing does not establish his involvement. She also contends that flight is insufficient to support a finding of participation in the act. The various evidence, however, must be viewed in combination, and so viewed, is sufficient. *278 Presence immediately after the incident, the absence of others in the area, and suspicious conduct such as flight, provide a preponderance of evidence of involvement in the act. Cf. Commonwealth v. Rhoades, 379 Mass. 810, 812-816 (1980). Commonwealth v. Sampson, 7 Mass. App. Ct. 514, 517-518 (1979). The credibility of conflicting testimony was a matter to be determined by the judge.
b. William Bunting. The BHA's termination of Mrs. Bunting's lease was based on William Bunting's participation in a firebombing. The evidence implicating William was very similar to the evidence concerning Mark McDonough. A neighbor testified that she had seen William Bunting and George Foley (a friend), both of whom she knew, running from the scene of the firebombing immediately after it occurred. She saw no one else in the area. Shortly afterward, she saw William return to the building containing the firebombed apartment, out of breath, and enter an apartment belonging to George Foley's uncle. George Foley's cousin testified that George and William had been together that evening, thus corroborating one aspect of the neighbor's testimony. For the reasons given in our discussion of Mark McDonough, this evidence was sufficient to support a finding that William participated in the firebombing.
5. Racial Motive.
Bunting questions the judge's finding that William Bunting's firebombing of a neighboring apartment was racially motivated. The only evidence bearing on this issue was the victim's testimony that a man residing with her was part Micmac Indian. We need not consider whether this was a sufficient indication of racial motive, however, because the finding of motive was surplusage. A firebombing, whether or not motivated by racism, is an act of random and extremely dangerous violence. The presence of racial hostility may add to the urgency of the problem and the likelihood that more violence will ensue, but it is not necessary to justify prompt remedial action by the BHA.
6. Conclusion.
We conclude that the lease forms signed by both tenants, and the termination provisions of G.L.c. 121B, § 32, authorize *279 the BHA to terminate housing project tenancies on the basis of serious acts of violence, committed at the projects by members of the tenants' household. Although the BHA need not demonstrate that the tenant knew or had reason to know of the household member's propensity for violence, or that she could have controlled his conduct, the "cause" requirement of G.L.c. 121B, § 32, provides relief from termination when special circumstances indicate that the tenant could not have foreseen the misconduct or was unable to prevent it by any available means, including outside help. With this limitation, at least, termination based on a preponderance of evidence that a member of the tenant's household committed serious acts of violence on BHA premises is consistent with due process. In the present cases, the tenants identified no special circumstances to negate the inference of awareness and control, and the judge's findings with respect to violent acts were supported by sufficient evidence. Therefore, we affirm the judgment in each case.
So ordered.
NOTES
[1] The respondent had related to Dr. Moore incidents of voyeuristic behavior as an adolescent. Additionally, while attending college, he would enter women's dormitories through windows and pull the blankets off sleeping women so that he could look at them. The respondent also told Dr. Moore of an assault with intent to rape that he was charged with in Rhode Island.
[2] The BHA cannot, of course, "evict" a tenant without the aid of the summary process statute, G.L.c. 239, § 1, which authorizes a person legally entitled to possession of land or tenements to bring an action to recover possession. See G.L.c. 184, § 18. The outcome of the summary process action depends on whether the tenancy has validly been terminated, which depends in turn on the meaning and validity of the termination provisions of the lease. See Boston v. Talbot, 206 Mass. 82, 92-93 (1910).
[2] The BHA cannot, of course, "evict" a tenant without the aid of the summary process statute, G.L.c. 239, § 1, which authorizes a person legally entitled to possession of land or tenements to bring an action to recover possession. See G.L.c. 184, § 18. The outcome of the summary process action depends on whether the tenancy has validly been terminated, which depends in turn on the meaning and validity of the termination provisions of the lease. See Boston v. Talbot, 206 Mass. 82, 92-93 (1910).
[3] Each tenant questions the sufficiency of the finding that her son committed the acts charged. In addition, Mrs. Bunting disputes a finding that she knew or had reason to know of her son's propensity for violence, and a finding that her son's conduct was racially motivated. We address these arguments, to the extent necessary, in the later sections of this opinion.
[4] The judge allowed Mrs. Bunting's requests for findings that she did not know or have reason to know her son (1) would commit the act charged or (2) intended to commit violent acts against the residents of the firebombed apartment. He found, however, that Mrs. Bunting "knew or should have known of her son's violent tendencies particularly with reference to the occupants of [the firebombed] apartment."
[5] See Spence v. Reeder, 382 Mass. 398, 402 (1981), in which we summarized findings that "[a] state of emergency relative to safety and security existed in many BHA developments. The emergency was `worsened' by acts of violence by certain tenants against other tenants and against BHA employees and property and by other illegal conduct. Many acts of violence appeared to be racially motivated."
[6] This was reaffirmed by an amendment to § 32, added after the present cases arose. The amendment provides for expedited eviction procedures when "there is reasonable cause to believe that the tenant or a member of the tenant's household" has committed certain acts, including possession or use of an explosive or incendiary device on or near a housing project. G.L.c. 121B, § 32, as amended through St. 1981, c. 510 (emphasis added). The inclusion of acts by household members among the types of conduct singled out for expedited treatment clearly indicates that the Legislature viewed such acts as "cause" for termination. See Weston v. Maguire, 10 Mass. App. Ct. 540, 541 (1980).
[7] See infra. part 3 (a).
[8] Caldwell v. Zaher, 344 Mass. 590, 592 (1962), stated the rule that a parent is not vicariously liable for the torts of a child unless "the parent knows or should know of the child's propensity for the type of harmful conduct complained of, and has an opportunity to take reasonable corrective measures." See Sabatinelli v. Butler, 363 Mass. 565, 568-571 (1973); DePasquale v. Dello Russo, 349 Mass. 655, 657-659 (1965). The tenants' reliance on these tort decisions is misplaced. First, the Legislature has since enacted a statute, G.L.c. 231, § 85G, as appearing in St. 1979, c. 172, that holds parents liable for "any willful act committed by [an unemancipated child under age eighteen] which results in injury or death to another person or damage to the property of another," apparently without regard to the parents' scienter or opportunity for control. Further, the question of eviction from public housing on the ground of acts by household members that endanger the safety and property of other tenants is quite different from that of compensation for the victims of children's torts, and we do not consider either G.L.c. 231, § 85G, or prior decisions on vicarious liability, as determinative of the issues in this case.
[9] William Bunting had a long history of delinquent conduct, and Mrs. Bunting had been warned by the woman whose apartment was firebombed that members of the Bunting household had been vandalizing the apartment. Mrs. Gormley's son Mark McDonough is alleged to have participated in two violent incidents; a firebombing on May 11, 1980, and an assault against a BHA employee on July 17, 1980. Mark's arrest for the firebombing on May 13 should have alerted Mrs. Gormley to the possibility of violence.
[10] The judge presiding at Gormley's trial made no findings with respect to scienter or ability to control. The judge at Bunting's trial found that Bunting had reason to know of her son's propensity for violence, but had no control over his actions.
[11] Many courts have held that the tenants have constitutionally protected property interests in their tenancies, and so are entitled to fair procedures to determine whether their protected interests have been infringed. E.g., Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937, 943 (2d Cir.1974); Caulder v. Durham Hous. Auth., 433 F.2d 998, 1002-1003 (4th Cir.1970), cert. denied, 401 U.S. 1003 (1971). See generally Vitck v. Jones, 445 U.S. 480, 488-491 (1980); L. Tribe, American Constitutional Law 522-563 (1978). It is a different question, however, whether the due process clause of the United States Constitution places substantive limits on the BHA's, and the Legislature's, ability to define the boundaries of the tenant's interest. Substantive restrictions on government action have been based only on explicit constitutional guarantees, or on the most fundamental concepts of dignity and justice in the relationship between government and individual. See generally Moore v. East Cleveland, 431 U.S. 494, 541-551 (1977) (White, J., dissenting); L. Tribe, supra at 889-896. We are, then, on sensitive ground, and proceed with restraint.
[12] Gormley suggests that in the case of her son, who is in prison, parole could be conditioned on his not returning to the project. The BHA, however, has no control over the terms of his parole.
[13] Mrs. Gormley's son, Mark McDonough, is now serving a six-to-ten year prison sentence. The judge nevertheless determined that Mark might return to Faneuil "in the near future." This conclusion was based on consideration of Mark's sentence (six-to-ten-years), time already served (more than a year), and the possibilities of parole under G.L.c. 127, § 133 (after two-thirds, or possibly one-third, of the minimum sentence), special credits, and furloughs.
[14] A significant body of accepted law imposing legal burdens without fault negates the possibility that due process requires that government action be based on culpability or carelessness. See Lambert v. California, 355 U.S. 225, 230-231 (1957) (Frankfurter, J., dissenting); Morrisette v. United States, 342 U.S. 246, 252-259 (1952). Thus, the problem is at most one of responsibility, in the sense of some contribution or connection on the part of the individual to undesirable acts or omissions.
[15] We do not attempt to determine whether the tenants' interests are simply "property," as opposed to "liberty" interests, or whether such a distinction has any relevance to the degree of process due.
[16] The tenants would add to the balance their asserted interest in freedom from punishment for acts for which they were not personally responsible. Whatever the extent of this interest, however, it is not the right at stake in the proceedings, and adds no weight to the tenants' procedural claims. The relevant interest is the interest in continued tenancy in public housing projects.
[17] The issue of the tenants' responsibility under G.L.c. 121B, § 32, also depends largely on objective facts. The fact that the wrongdoer was a household member raises the inference of awareness of problems and ability to prevent violent acts on the premises. Rebuttal will generally consist of the wrongdoer's age and prior record, or definite steps taken by the tenant to obtain help in avoiding violence.
[18] Mrs. Gormley does not contest the finding that Mark assaulted a BHA employee, which was based on the employee's testimony that Mark had taunted him with racial insults, threatened to kill him, and swung at his head with a large stick.