## MICHAEL C. HILL, petitioner.

Plymouth. January 10, 1996. - February 23, 1996.

Present: LIACOS, C.J., ABRAMS, LYNCH, O'CONNOR, & FRIED, JJ.

*Sex Offender. Practice, Civil,* Sex offender. *Evidence,* Sex offender. *Constitutional Law,* Double jeopardy, Sex offender. *Due Process of Law,* Sex offender.

Where proceedings against a sexually dangerous person pursuant to G. L. c. 123A are not punitive in nature, principles of double jeopardy are not implicated so as to preclude an appeal by the Commonwealth under G. L. c. 231, § 113, from a Superior Court judge's determination that a petitioner seeking release from his commitment was no longer a sexually dangerous person: the Commonwealth may properly seek appellate review of such a determination before the judgment becomes final. [151-155]

In the circumstances of a hearing on petitions for release from commitment as a sexually dangerous person, pursuant to G. L. c. 123A, § 9, the matter was remanded for reconsideration of the evidence in light of the petitioner's refusal to be examined for the hearing and his refusal to participate in treatment, as that bears on the Commonwealth's burden of proof. [156-157]

PETITIONS filed in the Superior Court Department on February 20, 1987, and September 6, 1990, respectively.

The cases were consolidated and heard by *Robert Malcolm Graham,* J., and a motion for reconsideration was heard by him.

A motion for stay of release filed in the Appeals Court was heard by *J. Harold Flannery,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Pamela L. Hunt,* Assistant Attorney General, for the Commonwealth.

*Joan C. Stanley* for the plaintiff.

FRIED, J. The Commonwealth appeals from a Superior Court judge's determination that the petitioner, Michael C. Hill, is no longer a sexually dangerous person (SDP). We

must determine whether the Commonwealth has a right to appeal from this determination, and, if it does, whether the Superior Court's decision was erroneous.

I

During the early morning hours of September 4, 1979, Hill, armed with a knife, broke into the house of a former girl friend's sister. He put a pillow case over her face, undressed her, fondled and raped her, having threatened her children if she resisted. In 1980 the petitioner pled guilty to rape, armed assault in a dwelling, and assault by means of a dangerous weapon. He was sentenced to a prison term of from ten to fifteen years for the armed assault in a dwelling, which has since expired. The assault by means of a dangerous weapon was filed by order of the court. With respect to the rape conviction the Superior Court held a G. L. c. 123A, § 5 (1988 ed.) hearing, determined the petitioner to be an SDP, and committed him to the treatment center of the sexually dangerous (treatment center) for one day to life. In 1987 and 1990 the petitioner filed petitions for release pursuant to G. L. c. 123A, § 9 (1988 ed.). The appeals were consolidated and heard during a two-day period in May of 1995 (section nine hearing).

The Superior Court judge found the following facts at the section nine hearing. For the first seven years at the treatment center, the petitioner participated in the treatment program. Then, in 1987 and for the next six years, he "refused every form of therapy offered at the Treatment Center." In August, 1994, he became "minimally involved" in therapy once again.

At the hearing, the Commonwealth presented two qualified examiners,[1] Doctors Kiley and Greif, and their reports. Kiley and Grief had both attempted to interview and examine the petitioner for the purpose of evaluating him with regard to his status as an SDP, but the petitioner had refused to speak to either of them. Both doctors then reviewed the petitioner's treatment center records and concluded that the petitioner remained an SDP as defined by statute. Although Dr. Kiley found that the petitioner had made some progress while he

---

[1]"Qualified examiner" is defined·in G. L. c. 123A, § 1 (1994 ed.).

was participating in therapy,[2] he recognized that the petitioner had failed to meet certain treatment "milestones" due to his refusal to participate in the therapy from 1987 to 1994. In his testimony Dr. Greif characterized Hill's sexually dangerous conduct as repetitive and compulsive. He based this opinion on the petitioner's past conduct and social history.[3] The Superior Court judge noted, however, that there was "no current information available to Dr. Greif on which to base these findings."

The Commonwealth also presented Dr. Uri Amit, the chair of the restrictive integration review board/community access board (review board),[4] to speak on behalf of the review board and to explain its report.[5] The Legislature established the

[2]Dr. Kiley stated that the petitioner's progress was evidenced by his: (1) admitting to committing the governing offense; (2) admitting that other offenses were sexually motivated; and (3) showing a willingness to share secrets.

[3]As a basis for this determination, Dr. Greif considered the petitioner's governing offense, criminal history (including charges of lewd and lascivious behavior and attempted breaking and entering where the petitioner reported that he intended to rape the person in the dwelling), personal history (including rape fantasies), and the petitioner's progress since commitment.

[4]In 1993, the Legislature enacted a statute that created the community access board (CAB) and expressly repealed the statute that created the restrictive integration review board (RIRB). See St. 1993, c. 489, §§ 1-8. The effect of this action was to shift control of this review board and the treatment center from the Department of Mental Health (DMH) to the Department of Correction. Compare St. 1985, c. 752, § 1, codified as G. L. c. 123A, § 8, with G. L. c. 123A, §§ 1 & 6A. The petitioner's section nine hearing occurred after the Legislature had repealed the statute that created the RIRB, but before the new statute creating the CAB had been fully implemented due to the existence of a Federal consent decree that required that primary responsibility for the treatment center be exercised by the DMH. See *Langton* v. *Johnston*, 928 F.2d 1206, 1227-1228 (1st Cir. 1991). Modification of the consent decree had not occurred at the time of Hill's hearing, thus the DMH still controlled the treatment center and the review board.

[5]Prior to the evidentiary hearing, the petitioner sought to exclude the testimony of the chair of the restrictive integration review board (RIRB)/ community access board (CAB), and his reports as unauthorized by law because, by statute, the board no longer existed, and its successor had not become authorized by law. See note four above. The Superior Court judge denied this request. The petitioner challenges this decision on appeal. Although the petitioner did not take a cross appeal from the Superior Court judgment, because we remand this case we note our agreement with the

board to review annually the progress of each person adjudicated an SDP, to determine whether each person is able to participate in a program designed to integrate him into society, and to evaluate each person's status as an SDP. See G. L. c. 123A, § 8 (1986 ed.); G. L. c. 123A, § 6A (1994 ed.). By statute, the reports generated by the review board are admissible in a section nine hearing. *Id.* The petitioner refused to be interviewed by the board. Nonetheless, Dr. Amit testified that the board had also determined that the petitioner remained an SDP. The board found that the petitioner's conduct tended to be repetitive and that the petitioner had made negligible progress in therapy due to his failure to participate in recent years.

The petitioner offered his own expert, Dr. Ronald Stewart. Dr. Stewart interviewed the petitioner, received a letter from him, and reviewed the relevant treatment center's documents. Dr. Stewart opined that the petitioner was no longer an SDP. The hearing judge declined to consider Dr. Stewart's testimony, finding that Dr. Stewart had little or no experience in SDP evaluations and that, even if he were to rule Dr. Stewart was qualified, his testimony was neither credible nor persuasive.

The hearing judge held that the Commonwealth had not carried the burden of establishing that the petitioner is currently an SDP beyond a reasonable doubt. Relying primarily on *Page* v. *Commonwealth*, 13 Mass. App. Ct. 384 (1982), the judge cited the absence of evidence of recent sexual misconduct as the basis for his determination. Although each of the Commonwealth's witnesses found the petitioner to be an SDP at present, the judge discounted these findings because, "given the paucity of present-day information, each witness had substantial difficulty in describing a clinical basis for linking present day behavior to past sexual misconduct." The Commonwealth then moved for reconsideration, and it was denied. It then filed an appeal under G. L. c. 231, § 113 (1994 ed.), from both the denial of the motion for reconsideration and

reasoning of the Superior Court judge in his memorandum and order of June 21, 1995, on this issue. The anomalous legal situation of the review board at the time of the petitioner's section nine hearing did not deprive its judgments and conclusions of all relevance and persuasive force on the issues it addressed, and the petitioner has alleged no prejudice as a result of the peculiar status of the review board.

the underlying order and obtained a stay of release from a single justice of the Appeals Court. The petitioner sought review of the stay by a single justice of this court. The single justice declined to vacate the stay, and this court granted direct appellate review. We now reverse the judgment of the Superior Court and remand the case to that court for further proceedings. Pending the outcome of such proceedings the order of the single justice of the Appeals Court staying the petitioner's release remains in effect.

## II

## A

The Commonwealth asserts a right to appeal under G. L. c. 231, § 113 (1994 ed.). Section 113 states that "[a] party aggrieved by a final judgment of the superior court . . . may appeal therefrom." We specifically left open the issue of the Commonwealth's right to appeal a G. L. c. 123A determination in *Swanson, petitioner*, 403 Mass. 1004 (1988).[6] In that opinion we referred to the prohibition against double jeopardy and due process concerns as possibly restricting the Commonwealth's right to appeal a G. L. c. 123A determination. *Id.* The petitioner now challenges the Commonwealth's right to appeal on those grounds.[7]

The petitioner's challenge proceeds from the premise that because the Legislature and the courts have required significant procedural protection in a c. 123A proceeding, see, e.g., G. L. c. 123A, § 5 (1986 ed.) (notice and right to counsel); *Commonwealth* v. *Travis*, 372 Mass. 238, 246-251 (1977) (imposing procedural safeguards); *Andrews, petitioner*, 368 Mass. 468 (1975) (requiring proof of dangerousness beyond a reasonable doubt); *Gomes* v. *Gaughan*, 471 F.2d 794, 799-800 (1st Cir. 1973) (imposing procedural safeguards), the prohibi-

[6]There is no distinction between the initial section five hearing and the periodic review hearing pursuant to section nine.

[7]In *Commonwealth* v. *Barboza*, 387 Mass. 105, 115, cert. denied, 459 U.S. 1020 (1982), we held that an initial c. 123A hearing did not place a petitioner at risk of double jeopardy because the "issues before the court and the evidence presented were entirely different in the two proceedings." See also *Commonwealth* v. *Dagel*, 345 Mass. 539, 541, cert. denied, 375 U.S. 863 (1963). In contrast, the petitioner here argues that an appeal from a section nine hearing may subject him to a second prosecution for the same offense.

tion against double jeopardy, as an aspect of due process, also applies. But that conclusion does not follow. How much and what process is due is a function of the gravity of the consequences that government decision making may visit on those subject to it, and not of any rubric under which that decision may fall. See *Mathews* v. *Eldridge*, 424 U.S. 319, 334-335 (1976). A government may deprive a person of his liberty, and this calls for procedures that offer considerable assurance against erroneous decisions and the fullest opportunity to challenge what government seeks to do. *Id.* at 339-349. See *Goldberg* v. *Kelly*, 397 U.S. 254 (1970). Such safeguards satisfy not only the heightened need for accuracy when so much is at stake, but also the related but distinct need to assure a person subject to government power that he has not been a mere passive object of an inquiry, however thorough, but an equal participant whose voice has fully been heard. These concerns are fully respected in c. 123A hearings where the Commonwealth bears the burden of proof beyond a reasonable doubt, and the subject has the right to the assistance of counsel and ample rights of confrontation. But the prohibition against double jeopardy, like the privilege against self-incrimination, the right to indictment by a grand jury, and trial by a petit jury, is not a necessary means for assuring either this accuracy or participation. Rather, these protections are historically based safeguards against the misuse of government power in the particular context of proceedings leading to specifically criminal sanctions. See *Allen* v. *Illinois*, 478 U.S. 364, 375 (1986) (discussing role of the privilege against self-incrimination); *Duncan* v. *Louisiana*, 391 U.S. 145 (1968) (discussing role of jury); *Hurtado* v. *California*, 110 U.S. 516 (1884) (discussing role of grand jury); *United States* v. *Hogan*, 712 F.2d 757 (2d Cir. 1983) (same). See also *Commonwealth* v. *Barboza*, 387 Mass. 105, 113, cert. denied, 459 U.S. 1020 (1982) (discussing role of double jeopardy). Both our decisions and those of the Supreme Court of the United States have consistently recognized that these historical safeguards do not apply except where criminal punishment may be imposed, even if the consequence for the subject of the proceeding may be as, or more severe, than some criminal sanctions. See, e.g., *Slochower* v. *Board of Higher Educ. of New York City*, 350 U.S. 551 (1956) (discharge from public employment); *Helvering* v. *Mitchell*, 303 U.S. 391 (1938)

(acquittal on charge of tax evasion does not bar assessment and collection of additional tax); *Sullivan* v. *Commonwealth,* 383 Mass. 410 (1981) (civil paternity action); *Arthurs* v. *Board of Registration in Medicine,* 383 Mass. 299 (1981) (revoking license to practice a profession). Nevertheless, it is also clear that whether the protection of double jeopardy applies cannot be allowed to be a matter of labels, lest that protection be conjured away by terminological sleight of hand. *United States* v. *Halper,* 490 U.S. 435, 446-449 (1989). Whether a consequence visited upon an individual constitutes criminal punishment, therefore, must depend on an analysis of the nature, purposes, and context of that imposition. We have very recently conducted an exhaustive survey of our own and the Federal authorities on this issue and set forth a detailed analysis of when a consequence should be considered punishment for purposes of the prohibition against double jeopardy. *Luk* v. *Commonwealth,* 421 Mass. 415 (1995). We concluded that "[c]ivil sanctions are punishment only if they cannot be explained without reference to a retributive or deterrent purpose. Double jeopardy is not implicated if the sanctions can be entirely explained by a nonpunitive purpose." *Id.* at 422.

In *Barboza, supra* at 111-113, we considered whether G. L. c. 123A proceedings were punitive in nature with respect to the right to a trial by jury. We held that they were not.

> " 'General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted "with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him." *Commonwealth* v. *Rodriguez,* [376 Mass. 632, 646 (1978)].' *Commonwealth* v. *Knowlton,* [378 Mass. 479, 483 (1979)]. 'The statute . . . does not intend punishment and does not in terms impose it, and nothing therein justifies punitive treatment or confinement under any prison conditions, except such as are reasonably required for security. . . . Indeed, implicit in the statute and its purpose is the obligation to provide an environment conducive to a cure or an alleviation of the dangerous trait' (citations omitted). *Commonwealth* v. *Major,* 354 Mass. 666, 668 (1968), cert.

denied, 393 U.S. 1109 (1969). 'Both the Massachusetts court and legislature have made considerable effort to differentiate between the treatment of the sexually dangerous, on the one hand, and the penalizing of criminals on the other.' *Gomes* v. *Gaughan*, 471 F.2d 794, 800 (1st Cir. 1973)."

*Barboza, supra* at 111-112. See *Allen, supra* (holding that the Fifth Amendment right against self-incrimination does not apply in commitment proceedings for the sexually dangerous because the proceedings are not punitive); *Sheridan, petitioner*, 412 Mass. 599, 604 (1992) ("primary objective of c. 123A . . . is to care for, treat, and, it is hoped, rehabilitate the sexually dangerous person, while . . . protecting society"). Our analysis in *Barboza, supra*, of the nature of a c. 123A proceeding is equally applicable to the issue of double jeopardy.

Commitment to the treatment center and the treatment an SDP receives there is intended to provide an SDP with an opportunity to overcome his "general lack of power to control his sexual impulses" so that he can successfully reenter society. It does not serve as an additional punishment or deterrent measure. In fact, the statute provides an avenue for persons to request commitment to the treatment center. G. L. c. 123A, § 6A. Perhaps most significantly, G. L. c. 123A, § 9, permits an SDP to petition for release every year, and at each hearing the Commonwealth must prove beyond a reasonable doubt that the person is still sexually dangerous. See *Andrews, petitioner, supra* at 478-488. See also *Travis, supra* at 248 (holding that person may be recommitted only if it is established that he continues to be sexually dangerous). Thus, unlike a criminal prisoner, the SDP is continuously evaluated to determine if treatment is necessary, and, if not, the petitioner will be released from the treatment center, either to serve out his sentence in a correctional institution or to return to society if his sentence has expired.

The petitioner argues that, quite apart from the specific protection of double jeopardy, his rights as embodied in the concept of substantive due process prevent the Commonwealth from appealing the hearing judge's finding that he

is not sexually dangerous.[8] " 'So-called "substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin* v. *California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937).' *United Sates* v. *Salerno*, 481 U.S. 739, 746 (1987)." *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). In *Commonwealth* v. *Travis*, 372 Mass. 238, 246-251, (1977), we ruled that a person who has been adjudicated no longer an SDP and conditionally released, cannot be recommitted as an SDP on the sole basis that he has breached the conditions of his release. Rather he must be readjudicated an SDP under G. L. c. 123A, §§ 5 and 6. In the course of our analysis, we stated that "as a matter of fundamental fairness under the due process clause . . . a finding that an individual is no longer sexually dangerous must be immune from subsequent or collateral attack as is a criminal judgment of acquittal." *Id.* at 249. See *Commonwealth* v. *Purdy*, 408 Mass. 681, 685 (1990) (substantive due process requires some degree of finality). By this passage, we were referring to attacks on a judgment that a person is no longer sexually dangerous after that judgment had become final. Due process in this context implies an aspect of constitutionally compelled res judicata. In *Travis, supra*, the Commonwealth was attempting to recommit an individual after the issue of sexual dangerousness had been decided by a Superior Court judge and the time for appeal had run. In this case, allowing an appeal not only occurs before the judgment is final, but also comports with our sense of ordered liberty. The statute allows an SDP continually to challenge his status as sexually dangerous, while the Commonwealth may assure the legal correctness of each such adjudication by invoking appellate review. This is particularly appropriate where the right to a trial by jury is not implicated and the appellate process does not trench on a jury's historic preserve. See *Barboza, supra* at 112-113 (no constitutional right to a trial by jury in section nine cases, although recent amendment to § 9 allows for a jury trial option, St. 1993, c. 489, § 7).

---

[8]Procedural due process is not an issue in this appeal. The petitioner has been afforded all the procedural due process that the statute and this court have required.

### B

. The Commonwealth argues that the Superior Court judge committed an error of law in concluding that the petitioner was no longer an SDP, because the judge required the Commonwealth to provide current psychiatric information about the petitioner's status. The Commonwealth bears the burden of establishing beyond a reasonable doubt that the petitioner continues to be an SDP at the time of the section nine hearing. See *Andrews, petitioner, supra* at 484-486; *Page, supra* at 386-387. An SDP is "any person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of sixteen years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires." G. L. c. 123A, § 1 (1994 ed.) Weighing and crediting the testimony are for the trier of fact, and we will not substitute our judgment for that of the trier of fact. *Commonwealth* v. *Walsh*, 376 Mass. 53, 58 (1978). Nevertheless, we will scrutinize the propriety of the legal criteria employed by the hearing judge and the manner in which those criteria are applied to the facts.

The hearing judge, relying on *Page, supra*, required the Commonwealth's experts to present a "clinical basis for linking present behavior to past sexual conduct." The circumstances in *Page*, however, were different. In *Page*, the hearing judge gave no indication that the petitioner was anything but forthcoming in his examinations; yet the Commonwealth's experts were unable to muster any evidence that the petitioner was still an SDP. In fact, the experts in *Page* testified that in their opinion the petitioner was no longer sexually dangerous, and yet the hearing judge found the petitioner to be an SDP. An Appeals Court justice reversed the determination of the Superior Court judge, reasoning that the hearing judge overlooked the fundamental principles of a section nine determination, particularly that the petitioner must be found sexually dangerous at the time of the hearing. *Id*. at 387.

In the case at bar, the experts and the reviewing board concluded that the petitioner continued to be sexually dangerous as defined by the statute. The experts and board drew

conclusions about his present state of mental health from all the evidence available to them, including the petitioner's refusal to be examined for the section nine hearing, his willingness to return, at least partially, to treatment, his progress in treatment prior to refusal, and his refusal to participate in treatment. Nonetheless, the hearing judge faulted the experts and found their testimony insufficient to establish beyond a reasonable doubt that Hill was currently an SDP. He based his conclusion on two related omissions: the experts were unable to adduce any examples of contemporaneous or recent conduct indicating sexual dangerousness, nor were their conclusions based on any other kind of recent evidence tending to show sexual dangerousness. Examples of recent conduct showing sexual dangerousness may often be lacking where the individual's dangerous disposition is of a sort that there will be no occasion for that disposition to manifest itself in a secure environment. And it cannot be the case that an individual's refusal to submit to examination or to participate in treatment, in which his current dispositions might manifest themselves, will more or less automatically guarantee himself a favorable determination. Yet this comes close to being what the hearing judge allows by his conclusion. That the subject refuses to cooperate, however, does not lighten the Commonwealth's burden, but the Commonwealth is free to make its case by such evidence as is available to it, distant and inferential as it may be. That is what the Commonwealth sought to do here. It extrapolated from earlier incidents which certainly did show dangerousness, and it carried the extrapolation to the present by considering whether as a general matter this type of dangerous disposition has a tendency to persist. The Commonwealth noted further that the treatment the petitioner refused is one way that this possibly persistent disposition might be lessened or turned in more positive directions. We cannot say that the inferences which the Commonwealth asks us to draw are unjustified or the evidence insufficient as a matter of law. Neither can we say, however, what the Superior Court judge would have decided had he considered this evidence in the way we now indicate.

Accordingly, we remand the case for a reevaluation of the evidence, and continue the stay of petitioner's release pending the outcome of such further proceedings.

*So ordered.*