COMMONWEALTH *vs.* PAUL F. SHEDLOCK, JR.

No. 02-P-1671.

Plymouth. February 13, 2003. - June 30, 2003.

Present: LAURENCE, GELINAS, & MILLS, JJ.

*Sex Offender. Practice, Civil,* Sex offender. *Statute,* Construction. *Words,* "Release."

This court concluded that, whether the meaning of G. L. c. 123A, § 12(*a*), the statute governing proceedings for civil commitment of "sexually danger-ous persons," appeared clear on its face or was deemed to be ambiguous, the notice and petition authorized by G. L. c. 123, § 12, were appropriately filed by the Commonwealth at the time the defendant in this case was about to be released into the community, at the end of all of a series of sentences he was serving, and not at the end of that portion of his ongoing incarceration technically attributable to his sexual offense; consequently, the Commonwealth's petition for temporary commitment of the defendant pursuant to G. L. c. 123A, § 12(*e*), was timely and, in view of the judge's finding on the defendant's motion to dismiss the petition that the Com-monwealth made a sufficient showing for temporary commitment of the defendant pending a probable cause hearing, this court reversed the order of the judge denying the Commonwealth's motion under § 12(*e*) and remanded the case to the Superior Court for further proceedings. [450-458]

CIVIL ACTION commenced in the Superior Court Department on November 8, 2002.

A motion to dismiss was heard by *Patrick F. Brady*, J.

A proceeding for interlocutory review was heard in the Ap-peals Court by *Trainor*, J.

*Robert C. Thompson*, Assistant District Attorney (*Jeanne L. Holmes*, Assistant District Attorney, with him) for the Commonwealth.

*Nona E. Walker*, Committee for Public Counsel Services, for the defendant.

LAURENCE, J. In this case we address an important unresolved issue relating to the meaning of "release" as used in § 12(*a*)

(see note 1, *infra*) of the statute governing proceedings for civil commitment of "sexually dangerous persons." G. L. c. 123A, §§ 1, 12-14, as amended by St. 1999, c. 74, §§ 3-8.[1] The Supreme Judicial Court expressly declined comment on the issue in *Commonwealth* v. *McLeod*, 437 Mass. 286, 293 n.10 (2002).

In *McLeod*, the court dealt with a defendant who had been convicted in 1998 and 1992 of "sexual offenses" (rape and indecent assault and battery of a child and aggravated rape) as defined in the statute, G. L. c. 123A, § 1. McLeod served the sentences imposed for those sexual crimes and was released into the community. In 2000, he was convicted, placed on parole, and reimprisoned (upon probation violation) for crimes (assault, assault and battery, threatening to commit a crime, and drug possession) not falling within c. 123A. As McLeod's date of ultimate release from prison on account of the sentences imposed for those nonsexual crimes approached, the Commonwealth petitioned for his civil commitment as a person who remained sexually dangerous. McLeod moved to dismiss the petition on the ground that the statute applied only to persons who were incarcerated for an enumerated sexual offense at the time the petition was filed.

The court agreed that, since McLeod was not then serving a sentence for a defined sexual offense, he was "not eligible for potential civil commitment" under c. 123A. *Commonwealth* v. *McLeod*, *supra* at 292. The court stressed that McLeod had "completed his sentences for [his sexual offense] crimes" years before and held that the commitment statute could not have been intended to be applicable to "any defendant serving a sentence for any crime who had ever in the past committed an enumerated sexual offense, no matter how temporally distant." *McLeod*, *supra* at 292. The court did not, however, address the meaning of the word "release" as used in § 12(*a*) of the statute and explicitly refused to extend its holding to the situation of a defendant whose sentence for a statutorily enumerated sexual offense had expired but who remained incarcerated on account

---

[1]General Laws c. 123A, § 1, defines "sexual offenses" for which a "sexually dangerous person" may be civilly committed pursuant to §§ 12-14 after "release" from incarceration. See note 2, *infra*.

of a sentence for a nonenumerated offense that had been imposed either concurrently or consecutively. *McLeod, supra* at 293 n.10. See note 5, *infra.*

That situation is now before us. The defendant, Paul F. Shedlock, Jr., was indicted by a Plymouth County grand jury on May 26, 1976, on counts of rape and unnatural acts stemming from an April 1, 1976, incident during which he raped and sexually assaulted a female hitchhiker after threatening to cut out her tongue. On February 17, 1977, shortly before trial, the defendant defaulted and fled to Texas. On September 2, 1978, while in Texas, he forced his way into a young couple's hotel room, where he raped and sexually assaulted the woman occupant and robbed the couple, threatening their lives with a gun. He was arrested a short time later, and on October 16, 1978, he pleaded guilty in Texas to aggravated sexual abuse, aggravated robbery with a deadly weapon, and attempted burglary of a building, and was sentenced to six years in the custody of the Texas Department of Corrections. He was paroled in September, 1981, but was returned to prison in December, 1981, to serve a two-year sentence for the attempted burglary of a transmission parts store. He was released from Texas custody in October, 1984.

The defendant was eventually returned to Massachusetts by interstate rendition proceedings and tried by a jury on the 1976 charges. He was found guilty of rape and unnatural acts, and, on June 16, 1986, sentenced to not less than eight nor more than fifteen years on the rape conviction and not less than three nor more than five years for the unnatural acts conviction, the latter sentence to run concurrently with the rape sentence. The defendant's original release date based on these sentences was October 21, 2000.

In September, 1989, the defendant escaped and remained at large for 121 days. He was recaptured in New Jersey and was returned to custody in Massachusetts. His maximum release date on the rape conviction was revised to February 19, 2001, on account of his 121 days out of custody. As a result of his escape, he was tried, convicted, and (in March, 1990) sentenced to not less than two nor more than three years, to be served "consecutive to" his rape sentence. These two sentences were

aggregated according to Department of Correction regulations to determine a revised maximum release date of February 19, 2004. As a result of "good time credits" earned for participation in certain programs, pursuant to G. L. c. 127, § 129D (not including a sex offender program, in which the defendant refused to participate), his maximum release date was subsequently adjusted to December 13, 2002. The defendant never received a certificate of discharge for the rape sentence and has remained in custody continuously since his June, 1986, rape conviction, except for the time he was an escapee.

On November 8, 2002, the Commonwealth filed a petition for the defendant's civil commitment as a sexually dangerous person, pursuant to the provisions of G. L. c. 123A, § 12.[2]

[2]General Laws c. 123A, § 12, provides, in pertinent part:

"(*a*) Any agency with jurisdiction of a person who has been convicted of or adjudicated as a delinquent juvenile or a youthful offender by reason of a sexual offense as defined in section 1 or who has been charged with such offense but has been found incompetent to stand trial shall notify in writing the district attorney of the county where the offense occurred and the attorney general six months *prior to the release of such person*, except that in the case of a person who is returned to prison for no more than six months as a result of a revocation of parole or who is committed for no more than six months, such notice shall be given as soon as practicable following such person's admission to prison. In such notice, the agency with jurisdiction shall also identify those prisoners or youths who have a particularly high likelihood of meeting the criteria for a sexually dangerous person.

"(*b*) When the district attorney or the attorney general determines that the prisoner or youth in the custody of the department of youth services is likely to be a sexually dangerous person as defined in section 1, the district attorney or the attorney general at the request of the district attorney may file a petition alleging that the prisoner or youth is a sexually dangerous person and stating sufficient facts to support such allegation in the superior court where the prisoner or youth is committed or in the superior court of the county where the sexual offense occurred.

"(*c*) Upon the filing of a petition under this section, the court in which the petition was filed shall determine whether probable cause exists to believe that the person named in the petition is a sexually dangerous person. Such person shall be provided with notice of, and an opportunity to appear in person at, a hearing to contest probable cause.

"(*d*) . . . [Rights at the probable cause hearing]

"(*e*) If the person named in the petition is scheduled to be released from jail, house of correction, prison or a facility of the department of youth services at any time prior to the court's probable cause determination, the court, upon a sufficient showing based on the evidence before the court at that

After some procedural skirmishing, the defendant responded with a motion to dismiss the petition. His argument was that the petition had to have been brought prior to his "release" from his sentence for rape and was untimely and not maintainable thereafter, on the theory that G. L. c. 123A does not allow the commitment of an individual who, though continuously incarcerated, is no longer serving the sentence imposed for his sexual offense.

A Superior Court judge agreed with the defendant and denied the Commonwealth's motion for his temporary commitment pursuant to G. L. c. 123A, § 12(*e*), pending a probable cause hearing. Basing his decision on what he saw as "the logic" of *McLeod*, the judge thought that because the defendant was not serving a sentence for an enumerated sexual offense at the time of the petition's filing, he could not be in the class of individuals eligible for civil commitment as a sexually dangerous person. The judge acknowledged, however, that the question was "not free from doubt" because of the *McLeod* disclaimer. 437 Mass. at 293 n.10. He therefore decided to address the underlying issue, whether the Commonwealth had made a sufficient showing for a temporary commitment of the defendant pending a probable cause hearing.

The judge focused on the defendant's repeated and vicious sexual assaults, his long and violent criminal record, his history of substance abuse, his refusal to engage in a sex offender program while incarcerated, his high score on a statistical measure of recidivism, his history of flight based on his lengthy default on the Plymouth County charges and his 1989 escape, and a report as to the likelihood of his reoffending filed by the Commonwealth's expert. On the basis of those facts, the judge concluded that he had "no doubt" that the Commonwealth had made a "sufficient showing," § 12(*e*), for a temporary commitment pending a probable cause hearing. Further, the judge found, that "[w]ere [the defendant] a person eligible under [c. 123A] [the judge] would grant the Commonwealth's motion for

time, may temporarily commit such person to the treatment center pending disposition of the petition. The person named in the petition may move the court for relief from such temporary commitment at any time prior to the probable cause determination." (Emphasis added.)

a temporary commitment." In light of that conclusion, the judge ordered that the defendant remain in custody while the Commonwealth filed an interlocutory appeal to a single justice of this court, who in turn stayed the defendant's release pending the Commonwealth's expedited interlocutory appeal.

The Commonwealth contends the judge's extension of "the logic" of *McLeod* was contrary to the plain language, legislative intent, and rational operation of the statute. In particular, the Commonwealth attacks the practical consequence of the ruling for proceedings under G. L. c. 123A. It argues that the judge erred in effectively construing the word "release" in § 12(*a*) as the defendant proposed, which would require the Commonwealth to file its notice and petition for the civil commitment of a defendant such as Shedlock at the expiration of that portion of the defendant's period of incarceration specifically attributable to his conviction of a sexual offense, rather than at the end of his continuous period of incarceration when he will actually be released into the community. The Commonwealth points out that, under that reading, the prisoner's release (as here) may be years after the formal end of his sexual offense sentence and the filing of the Commonwealth's § 12(*b*) petition. The defendant asserts that such a requirement is precisely what *McLeod* envisioned (a proposition difficult to reconcile with the specificity with which the *McLeod* court refused to address whether its holding applied to facts such as those presented here).[3] We agree with the Commonwealth for several reasons.

*McLeod* itself furnishes the fundamental principle of our analysis. "[S]tatutory language should be given effect consistent

___

[3]The Commonwealth has argued that the application of G. L. c. 123A in *McLeod* is distinguishable and not controlling not only because of the court's explicit disclaimer, but also because the sentence McLeod was serving when the c. 123A proceeding was initiated was for a crime that occurred many years after his sexual offense and was entirely unconnected to that offense and the sentence therefor. See *McLeod*, 437 Mass. at 287, 292. By contrast, a logical nexus existed between the sentence for escape Shedlock was serving at the time of the petition at issue here and his original sexual offense sentence, because the imposition of the subsequent sentence was entirely attributable to his effort to escape from the earlier sexual offense sentence and a direct consequence of his having to serve that sentence. The two sentences were thus causally related. At the time the instant petition was filed, Shedlock was arguably incarcerated by reason of the sexual offense sentence, but for the existence of which he would not have been imprisoned. Cf. *id.* at 289. Our analysis

with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *McLeod*, 437 Mass. at 290, quoting from *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). Both the plain meaning of the operative word "release" and the clearly stated purposes of the Legislature in promulgating the present civil commitment process for sexually dangerous persons support the Commonwealth's position: "release" as used in § 12(*a*) must mean a sexual offender's release into general society at the end of a continuous period of incarceration that began with his conviction for a sexual offense.

Every dictionary definition of both the verb and the noun forms of "release" states, as their primary meaning, the action of liberation or setting free from confinement or restraint. See, e.g., Webster's Third New International Dictionary 1917 (1993); the American Heritage Dictionary of the English Language 1524 (3d ed. 1992); Black's Law Dictionary 1292 (7th ed. 1999). An inmate who reaches the date of the technical completion of his sentence for a sexual offense cannot be deemed to have been "released" as of that date, as that word is "understood in accordance with its generally accepted plain meaning" and with approved usage and common understanding, *Commonwealth* v. *Boucher*, 438 Mass. 274, 276, 279, 281 (2002), if he continues to be incarcerated for years thereafter on a sentence for a nonenumerated offense imposed to follow immediately on the heels of the prior sentence. See G. L. c. 4, § 6, cl. Third ("In construing statutes . . . [w]ords . . . shall be construed according to the common and approved usage of the language").

The Legislature's expectation that the "courts [would] apply the plain and ordinary meaning" of the language used in the civil commitment provisions of G. L. c. 123A, *Commonwealth* v. *Kennedy*, 435 Mass. 527, 530 (2001), was manifested by the unmistakably explicit statement of primary legislative purpose set forth in the preamble to St. 1999, c. 74: "[I]ts purpose . . . is to protect forthwith the vulnerable members of our communi-

---

herein is, however, not dependent on the presumed existence of any such causal relationship.

ties from sexual offenders," i.e., "to protect the public from sexually dangerous persons." *Commonwealth* v. *Bruno*, 432 Mass. 489, 500 (2000).

It would appear evident beyond the need for demonstration that the public requires no protection from potentially dangerous sexual predators so long as they remain incarcerated, for whatever reason, after their sexual offense sentence has come to an end. Nor is such protection needed at any time prior to their actually being reintegrated into the community on the occasion of their physical release from all restraint and confinement. As *McLeod* itself pertinently observed: "The thrust of the statutory scheme is that commitment petitions should be brought against persons . . . *who are about to be released into the community* but who, because they are sexually dangerous, are likely to commit another sexual offense, and, therefore, should not be released" (emphasis added). 437 Mass. at 291.[4]

Were further reinforcement of the Legislature's intended meaning for the word "release" in § 12(*a*) needed, it can be seen in the other recognized purpose of St. 1999, c. 74: "to provide [sexually dangerous persons] treatment, and rehabilitation." *Commonwealth* v. *Bruno*, 432 Mass. at 500. It is again evident that commitment for treatment as a sexually dangerous person cannot begin, much less be effective, until the date of the defendant's physical release from incarceration and transfer to the treatment center. See G. L. c. 123A, § 14(*d*) ("The order of commitment . . . forwarded to the treatment center . . . shall become effective . . . on the date of discharge from jail, the house of correction, [or] prison"). Compare *Com-*

---

[4]Cf. *Commonwealth* v. *Sheridan*, 51 Mass. App. Ct. 74, 76-77 (2001) (addressing the issue whether a from-and-after probationary sentence began when the continuously confined defendant technically had completed his prison sentences on his rape convictions or when he was subsequently released from the treatment center to which he had been committed as a sexually dangerous person while serving those sentences, this court held that "[t]he purpose of a probationary sentence is 'rehabilitation of the probationer and protection of the public.' . . . [T]he defendant['s being] separated from society and in an institutionalized setting . . . eliminated any need for the supervision of a probation officer. . . . *The two goals of probation — rehabilitation* under the supervision of a probation officer *and the protection of society — are only brought into play when the offender is released into the community*" [emphasis added]).

*monwealth* v. *Kennedy*, 435 Mass. at 530-531 (equating the terms "discharge" and "release" as used in c. 123A).

As demonstrated by the case of Shedlock himself, the important legislative goal of treatment for the purpose of achieving rehabilitation and reentry into society — the potential success of which the entire statutory scheme presumes, see *Hill, petitioner*, 422 Mass. 147, 154 (1996) — would be rendered a nullity by the defendant's construction of the statute. The Commonwealth would be required futilely to commence commitment proceedings with respect to a defendant who is impervious to meaningful rehabilitation while he continues serving a lengthy sentence in prison where he is able to frustrate any such efforts by refusing to undergo sex offender treatment.

Even if we were of the view that the word "release" as used in § 12(*a*) suffered from some imprecision or ambiguity requiring judicial interpretation,[5] rather than being clear from its plain meaning read in light of its explicit legislative intent and the workable result such a reading yields, see *Pyle* v. *School Comm. of S. Hadley*, 423 Mass. 283, 286 (1996), we would still agree with the Commonwealth's position. The frustration of the legislative objectives animating St. 1999, c. 74 — public protection and rehabilitative treatment — that would result from construing "release" as the defendant desires compels an interpretation that not only is reasonable but also makes the operation of the statute meaningful, useful, and practical. See *Massachusetts Commn. Against Discrimination* v. *Liberty Mutual Ins. Co.*, 371 Mass. 186, 190 (1976) (where a statute

[5]The defendant contends that ambiguity as to the meaning of "release" has been created by the Supreme Judicial Court itself, in its footnote disclaimer in *Commonwealth* v. *McLeod*, 437 Mass. at 293 n.10: "We do not decide whether a defendant may be committed . . . after release from a sentence for a . . . sexual offense but before release from a sentence for a nonenumerated offense . . . imposed . . . consecutively." It is obvious from the context, however, that the court was not purporting to rule upon the statutory meaning of "release" in § 12(*a*), which was never brought to its attention, and, in our view, used the word in its footnote in an imprecise fashion (as is not infrequent in dicta) that furnishes no precedent. See *Vigeant* v. *Postal Tel. Cable Co.*, 260 Mass. 335, 343-344 (1927); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 719 n.11 (1990); *Sheriff of Suffolk County* v. *Pires*, 438 Mass. 96, 101 n.5 (2002); *Commonwealth* v. *Shea*, 46 Mass. App. Ct. 196, 198 n.3 (1999).

"lacks precision . . . [or] the draftsmanship is faulty . . . the duty devolves upon us to give [it] . . . a reasonable construction [so as] . . . to carry out the legislative intent" [internal citations omitted]); *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996) (we cannot construe a statute in such a manner that "[t]he legislative effort would have . . . no practical effect . . . [or that] will defeat [the legislative] purpose"); *Milton Commons Assocs.* v. *Board of Appeals of Milton*, 14 Mass. App. Ct. 111, 116-117 (1982) (when interpreting a statute, we must "avoid[] a construction which would negate legislative intent or defeat its intended utility").

Judicial gloss on the 1999 amendments to c. 123A further demonstrates that the meaning the defendant urges for the word "release" would hinder, if not defeat, legislative intent. As earlier noted, adoption of the defendant's position would have required the Commonwealth to commence the civil commitment process against him by notice and petition at the end of his original rape sentence, despite the fact that his escape and additional sentence kept him imprisoned for several years thereafter. In *Bruno*, 432 Mass. at 498, the Supreme Judicial Court made it clear that "the conduct triggering the statute's application is not the prior conviction of a sexual offense, but the *current mental condition of a defendant. . . . The focus of . . . the statute's* various sections relating to the procedures governing commitment *is a defendant's current mental condition*" (emphases supplied).

Given that statutory focus — particularly in light of the pellucid intent of the statutory scheme to authorize commitment petitions against sexually dangerous persons who pose an actual danger to society because they "are about to be released into the community," *Commonwealth* v. *McLeod*, 437 Mass. at 291 — the defendant's position makes little sense. To require the Commonwealth to have filed its petition against him prior to the end of his rape sentence — which, as it turned out, was over two years before his scheduled release into the community — would do nothing but create duplicative, wasteful proceedings that could not have been intended by the Legislature. It is unlikely to the point of implausibility that the Commonwealth

could have then filed such a petition in good faith, ethically, or in compliance with *Bruno*. It would have had to aver that it had "sufficient facts to support" the allegation that the defendant "is a sexually dangerous person," G. L. c. 123A, § 12(*b*), based not only on his then "current mental condition" but also on the dubious assertion — whether express or implied — that he would continue into the future to have the requisite mental condition, however long it took for him finally to complete serving his consecutive sentences. Cf. *Commonwealth* v. *Bruno*, 432 Mass. at 504-506 (the fact the defendant was adjudicated not to be a sexually dangerous person several years earlier did not collaterally estop the Commonwealth from subsequently bringing a new commitment petition just prior to his release from prison, because "whether Bruno is currently a sexually dangerous person[] is [a] quite different [issue] from whether he was sexually dangerous" at that earlier time).

Had the Commonwealth been compelled and able to prove as of the end of his rape sentence that the defendant then had the requisite "current mental condition" to warrant committing him for treatment as a sexually dangerous person (although he could not have been so committed while remaining in prison) and then subsequently sought on that basis to commit him immediately upon his final discharge from confinement several years later, its earlier effort would have been fruitless. The defendant justifiably could challenge that subsequent commitment not only on basic due process grounds, *id.* at 502-504, but also by virtue of G. L. c. 123A, § 12(*e*) (person named in the petition may move court for relief at any time prior to probable cause determination). The Commonwealth would thereupon have the obligation of expending additional resources to undertake a second petitioning effort before his December, 2002, release date to justify the commitment on the basis of "current" facts, in effect starting all over again. The Legislature could not have intended the Commonwealth to bear the burden of pursuing multiple proceedings against a defendant, particularly given that the word "petition" is stated in the singular whenever

mentioned in G. L. c. 123A, § 12.[6,7]

In addition to generating wasteful and unnecessary proceedings, it is foreseeable that the defendant's construction of "release" would adversely affect prison discipline by encouraging sexual offenders to commit new, nonsexual crimes while imprisoned. They could thereby reduce the risk that they might ultimately be found sexually dangerous persons under G. L. c. 123A (which would make them subject to institutionalization for an indeterminate period up to life, G. L. c. 123A, § 14[*d*])

---

[6]Compare *Bell* v. *Treasurer of Cambridge*, 310 Mass. 484, 488-489 (1941) (by conferring temporary mayoral duties and salary on president of city council pursuant to statute, in order to replace mayor who had been convicted of bribery and stipulated in court he would not exercise his duties pending appeal but nonetheless brought litigation to recover his salary as an incident of his office, "the Legislature could hardly have intended to saddle a double liability upon the city"); *Commonwealth* v. *Williams*, 427 Mass. 59, 61-63 (1998) (juvenile transfer hearing legislation cannot, consistently with common sense and sound reason, be construed to require a separate and additional transfer hearing for a lesser included offense to which the defendant ultimately pleaded guilty as well as for the serious felony actually charged for which the statute expressly required such a hearing); *Hopkins* v. *Liberty Mutual Ins. Co.*, 434 Mass. 556, 561-563 (2001) (defendant's proposed interpretation of G. L. c. 176D, § 3[9][*f*], prohibiting unfair "settlements of claims" by insurers, to mean that a single ongoing act cannot constitute an actionable violation, was rejected because it would inevitably produce unnecessary, complex and contentious lawsuits). Shedlock's view of the statute would produce an even greater multiplicity of proceedings, for he asserts that had the petition been brought at the termination of his sexual offense sentence, he could have taken advantage of G. L. c. 123A, § 9. That provision gives a person determined to be sexually dangerous the right to file a petition for discharge, with jury trial demand, every twelve months. Such a filing puts the Commonwealth to the burden of proving beyond a reasonable doubt that the petitioner currently remains a sexually dangerous person. *Wyatt, petitioner*, 428 Mass. 347, 351-353 (1998). The likelihood of further proceedings is also enhanced because not only does the "statute [allow] an SDP continually to challenge his status as sexually dangerous, [but also provides that] . . . the Commonwealth may assure the legal correctness of each such adjudication by invoking appellate review." *Hill, petitioner*, 422 Mass. at 155.

[7]Shedlock also suggests an "alternative" interpretation of the statute that would require the Commonwealth to file its petition at the end of the sexual offense sentence but postpone all proceedings on that petition, including the probable cause determination, until the end of his consecutive sentence. In addition to entailing similar duplicative effort on the part of the Commonwealth, this interpretation violates the clear language of G. L. c. 123A, § 12(*b*) & (*c*), as well as the requirement that the petitioner allege and prove the defendant's "current mental condition."

simply because their additional crimes could extend their periods of incarceration until long after the termination of the underlying sexual offense sentence. During that extension they could decline sexual offender treatment while exhibiting no conduct indicating sexual dangerousness because of their confined and strictly regulated situation, so that at such future time as the Commonwealth would have to address its burden of proof, it might well be much more difficult to satisfy.[8]

We thus conclude that, whether the meaning of G. L. c. 123, § 12(*a*), appears clear on its face or is deemed to be ambiguous,[9] the notice and petition authorized by G. L. c. 123A, § 12, are appropriately filed at the time of the defendant's imminent

---

[8]The Commonwealth's potential difficulty is reflected in *Hill, petitioner*, 422 Mass. at 157, where the court reversed the dismissal of the Commonwealth's sexually dangerous person petition because the trial judge had relied on the Commonwealth's failure to produce "recent evidence" of "contemporaneous" or "recent conduct" indicating sexual dangerousness. The court observed, "Examples of recent conduct showing sexual dangerousness may often be lacking where the individual's dangerous disposition is of a sort that there will be no occasion for that disposition to manifest itself in a secure environment. . . . [I]t cannot be the case that an individual's refusal to submit to an examination or to participate in treatment, in which his current dispositions might manifest themselves, will more or less automatically guarantee himself a favorable determination [in the sexually dangerous person hearings]." The court noted, "That the subject refused to cooperate, however, does not lighten the Commonwealth's burden"; it was up to the trier of fact to weigh such evidence.

[9]The motion judge and the defendant both relied upon the so-called "rule of lenity" to support their position that the Commonwealth should have filed its notice and petition for civil commitment prior to the end of the rape sentence, when the defendant was supposedly "released" from his sex offense sentence, and has lost its power to do so by waiting to file until the defendant completed serving the remainder of his sentence for a nonsexual offense. Their reliance is unfounded in this case. That rule applies to criminal statutes defining criminal conduct. *Commonwealth* v. *George*, 430 Mass. 270, 278-279 (1999). General Laws c. 123A is a civil, not a criminal statute (except with respect to the "sufficient showing" standard of proof required to justify the deprivation of liberty resulting from temporary commitment, which, undefined in the statute, has been authoritatively construed in accordance with due process requirements). *Commonwealth* v. *Bruno*, 432 Mass. at 500, 507-510. Even were G. L. c. 123A, § 12, deemed criminal (including the word "release"), it is appropriately read and applied in accordance with its plain meaning and the explicit statement of statutory purpose. "Where the legislative purpose is expressed in clear statutory language, we must construe the statute in accordance with its terms and need not apply the rule of lenity on which the defendant relies." *Commonwealth* v. *Chavis*, 415 Mass. 703, 708

release into the community, at the end of all of the continuous sentences he is serving, and not at the end of that portion of his ongoing incarceration technically attributable to his sexual offense. The Commonwealth's § 12(*b*) petition with respect to Shedlock was therefore timely.

Accordingly, we hold that for purposes of G. L. c. 123A, § 12, the Commonwealth's November 8, 2002, petition for temporary commitment of the defendant pursuant to G. L. c. 123A, § 12(*e*), was timely. In the circumstances of this case, the release date that triggered G. L. c. 123A, § 12(*a*)-(*e*), was in December, 2002. Further, in view of the motion judge's finding that the Commonwealth made a sufficient showing for temporary commitment of the defendant pending a probable cause hearing, see *supra* at 449-450, the order of the Superior Court denying the Commonwealth's motion under G. L. c. 123A, § 12(*e*), is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion. The defendant's temporary commitment to the Massachusetts Treatment Center shall be in accordance with the guidelines set forth in *Commonwealth* v. *Bruno*, 432 Mass. at 511-513, except that the defendant shall be accorded the opportunity to appear in person at the hearing.

*So ordered.*

(1993). Moreover, the rule is only "a guide for resolving ambiguity [in the defendant's favor and against the Commonwealth], rather than a rigid requirement that we interpret each [criminal] statute in the manner most favorable to defendants." *Id.* at 707-708. It applies only to the substantive conduct covered by criminal statutes, to the end that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Commonwealth* v. *George*, 430 Mass. at 278, quoting from *Commonwealth* v. *Twitchell*, 416 Mass. 114, 123 (1993). The rule is not applicable to the circumstances here presented, because any ambiguity in the meaning of the word "release" in § 12(*a*) is unrelated to the definition of any criminal conduct and "only concerns matters of procedure which do not involve . . . substantive or fundamental rights." *Charles C.* v. *Commonwealth*, 415 Mass. 58, 70 (1993). Statutes, such as G. L. c. 123A, that are procedural "do not define criminal conduct, are not penal statutes, and may not be subject to such strict construction against the Commonwealth," *Commonwealth* v. *George*, 430 Mass. at 278-279; and even under the strict construction rule we do not reject "an available and sensible interpretation . . . in favor of a fanciful or perverse one." *Commonwealth* v. *Wotan*, 422 Mass. 740, 743 (1996).